## CANAL BANK & Others *v.* HUDSON & Another.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR
THE SOUTHERN DISTRICT OF MISSISSIPPI.

Submitted February 12th, 1884.—Decided March 24th, 1884.

*Devise—Equity—Lien—Parties—Statutes of Mississippi—Trusts.*

The plaintiffs, as creditors, whose debts were secured by a deed of trust on land
in Mississippi, having brought a suit in equity to enforce the trust and to
sell the land, joined as defendants, by a supplemental bill, persons in pos-
session, who claimed to own the land under a title founded on a sale made
under a judgment recovered prior to the execution of the deed of trust, but
which judgment had been held by this court, in the same suit (*Bank* v.
*Partee*, 99 U. S. 325), before the filing of the supplemental bill, to be void,
as against the plaintiffs. The defendants in possession set up a claim to
be allowed for the amount they had paid in discharge of a lien or charge
on the land created by a will devising the land to the original grantor in
the deed of trust, and for taxes paid, and for improvements. These claims
were allowed.

A devise of land was made by a will, upon specified conditions, "under the
penalty, in case of non-compliance, of loss of the above property," the con-
ditions being to pay certain money legacies, and a life annuity in money.
Then other legacies in money were given. Then there was a provision,
"that all the legacies which I have given in money and not charged upon
any particular fund" should not be payable for two years "after my de-
cease," followed by a provision as to the payment by the devisee of interest
on the first-named money legacies after she should come into possession of
the land devised. No other money legacies were given payable by any per-
son on conditions, and there were no other legacies in money which could
answer the description of legacies in money charged on a particular fund :
*Held,* That the life annuity was a charge on the land devised.

The statute of Mississippi, Revised Code of 1857, chap. 57, article 15, p. 401,
which provides, that "no judgment or decree rendered in any court held
within this State shall be a lien on the property of the defendant therein
for a longer period than seven years from the rendition thereof," does not
apply to a decree of a Court of Chancery in Mississippi, establishing the
arrears due on such life annuity as a specific lien on such land by virtue of
such will, in a suit in chancery brought by the life annuitant.

The will being proved and recorded in the county where the land was situated,
it was not necessary, in such suit in chancery by the life annuitant, to make
as defendant the trustee in a deed of trust made by the devisee under the
will, provided, in a suit to enforce the deed of trust, brought by the bene-
ficiaries under it, they were given the right to contest the validity of the
lien claimed by the life annuitant and to redeem the land from such lien,
when established.

The defendants claiming title under the devisee, and she being entitled to a distributive share of the entire estate of the life annuitant, who died during the pendency of such suit in chancery, it is not proper to abate from the allowance to the defendants of the amount paid by them to discharge the decree in such suit, any sum on account of the distributive share of such devisee in the amount so paid.

The defendants having acquired their title under a deed of trust executed after the original bill in this suit was filed, and before the grantor in such deed was served with process in this suit, it was held that they, being in fact purchasers in good faith, were not chargeable with notice of the intention of the plaintiffs to bring this suit, within the provisions of the Revised Code of Mississippi, of 1871, chap. 17, article 4, § 1557, in regard to allowances for improvements on land to purchasers in good faith, until they were served with process on the supplemental bill.

The meaning of the words "good faith" in the statute, and as applicable to this case, defined.

The amount allowed by the Circuit Court, for improvements, upheld as proper, under the special circumstances.

*Mr. William L. Nugent, Mr. Assistant Attorney-General Maury* and *Mr. W. Hallett Phillips* for appellants.

*Mr. Wiley P. Harris* and *Mr. Frank Johnston* for appellees.

MR. JUSTICE BLATCHFORD delivered the opinion of the court.

The litigation involved in this appeal is a continuation of that which was before this court in *Bank* v. *Partee*, 99 U. S. 325. The plaintiffs in the suit were appellants then and are appellants now. The original bill was filed April 1st, 1873, in the Circuit Court of the United States for the Southern District of Mississippi, by the appellants, as creditors of Sarah D. Partee and William B. Partee, her husband, to secure to them the benefit of a deed of trust executed by the debtors to one Bowman, covering lands in Yazoo County, Mississippi, the object of the deed being to provide for the payment of debts, among which were those due to the appellants. The Circuit Court excluded the appellants from the benefit of the deed of trust, because of their failure to notify in writing within a time limited by the deed their acceptance of its terms, and that court also held that the title to certain of the land covered by the deed had failed in the trustee because of a para-

mount title thereto perfected under a judgment recovered
against the debtors by one Stewart before the execution of the
deed of trust.   This court held that, notwithstanding the pro-
vision in regard to an acceptance in writing of the terms of
the deed, the appellants were entitled to its full benefits, and
that the judgment of Stewart was a nullity as respected Mrs.
Partee, who was the debtor to Stewart, and was the owner of
the lands covered by the deed of trust.   This court reversed
the decree below and remanded the cause for further proceed-
ings, in April, 1879.

Stewart and James D. Partee, a son of the debtors, had be-
come the purchasers of the land sold under the Stewart judg-
ment.   In May, 1879, after the filing in the Circuit Court of the
mandate from this court, the appellants filed a supplemental
bill.   One acre of the land bought by Stewart and a part of
the land bought by James D. Partee are involved in that bill
and in the present appeal.   The original deed of trust was made
November 19th, 1866.   The deed of the sheriff to James D.
Partee, on the sale under the Stewart judgment, was made
January 4th, 1869, the judgment having been recovered June
6th, 1866.   The land so conveyed to James D. Partee was in
quantity equal to 5¼ sections, and was all in township 9 of range
4 west in Yazoo County, embracing land in 7 different sections.
The land constituted what is known in this controversy as 2
plantations called " No Mistake," and " Tyrone."   In February,
1870, James D. Partee and his wife conveyed these plantations to
one Barksdale, in trust to secure an indebtedness of $41,500 to
the firm of Nelson, Lamphier & Co.   Under this deed of trust
the plantations were sold and conveyed by the trustee to one
Nelson, a member of that firm, in June, 1872.   On April 15th,
1873, Nelson conveyed the plantations to one Short, in trust to
secure an indebtedness of $35,000, embracing 18 promissory
notes, to said firm.   Two of these notes came to be owned by
Joseph P. Benson and two by Charles C. Ewing, as administrator
of S. S. Ewing, and they, with holders of others of the notes,
brought a suit in equity, in August, 1876, in the Chancery Court
of Yazoo County to foreclose said trust deed.   A decree of
sale was made in January, 1877, and the said Benson and Ewing

and one Robert G. Hudson purchased the lands at the sale, in February, 1877. On July 3d, 1877, Benson conveyed to Ewing and Hudson all his interest in the plantations. They are the appellees in this appeal.

The plantations were originally the property of one James Dick, who was the uncle of Mrs. Sarah D. Partee. They were known together by the name of " No Mistake." By that name they were devised by Dick, by will, to Mrs. Partee. The will was proved in March, 1849. Mrs. Partee's parents were Christopher Todd and Sarah Todd. The will contained these provisions :

" To my niece, Sarah D. Todd, wife of William B. Partee, of New Orleans, and to her heirs, I give and bequeath : 1st. My plantation, commonly called 'No Mistake' plantation, near Satartia, Yazoo County, State of Mississippi, with all the negroes, horses, mules, cattle, buildings, and farming utensils that may be found on said estate at the time of my death and belonging to me. 2d. I give and bequeath to the said Sarah D. Todd and to her heirs about six thousand acres of land, situated in this State, and entered by E. Lawrence and Brashear in my name. This bequest is made to Sarah D. Todd, wife of William B. Partee, upon the following conditions under the penalty, in case of non-compliance, of loss of the above property : The first of said conditions is that the said Sarah D. Todd, wife of the said William B. Partee, shall within the next ensuing month after my death pay to Miss Elizabeth Calhoun, of Maury County, State of Tennessee, and to Nathaniel Calhoun, and to Christopher Calhoun, his brother, children of Margaret Todd, wife of Charles Calhoun, and residing in Maury County, Tennessee, the sum to each of twelve thousand dollars ; that is to say, to Miss Elizabeth Calhoun the sum of twelve thousand dollars, to Nathaniel Calhoun the sum of twelve thousand dollars, and to Christopher Calhoun twelve thousand dollars, and in the case of the death of either or any of them without issue, then the sum or sums coming to said deceased parties or their heirs to be given to the survivor or survivors in equal proportions. The second of said conditions is that the said Sarah D. Todd and her heirs shall pay to Christopher Todd and to Sarah, his wife, my sister, one thousand dollars per annum during the life of either, payable as they or the survivor may require it."

The will then gives various lands and legacies in money to various persons named, and then proceeds:

"And my will is as follows : That all the legacies which I have given in money and not charged upon any particular fund is not demandable from any person whomsoever for the term of two years after my decease. . . . And should any legatee endeavor by action of any kind or nature, before any court in any State, to break, injure or destroy any of my dispositions, the bequest or legacy to such person or persons is annulled or rescinded by me. The legacies of $12,000 each to Elizabeth Calhoun, Nathaniel Calhoun and Christopher Calhoun may be paid by Sarah D. Todd, wife of William B. Partee, in the following manner, viz. : To Elizabeth Calhoun on the day of her marriage, and to Nathaniel and Christopher when they become of age, upon condition that the said Sarah D. Todd pays to the said legatees annually interest at seven per cent. upon their respective legacies, after she comes in possession of ' No Mistake' plantation."

Mrs. Todd having died in 1853, and Christopher Todd having been paid his annuity up to January 1st, 1861, he filed a bill in chancery, in November, 1867, in the Chancery Court of Yazoo County, against William B. Partee and his wife, claiming that such annuity was a charge on the land so devised to Mrs. Partee, and praying for a sale of the land to pay the arrears due on the annuity. Christopher Todd having died during the pendency of the suit, it was revived in the name of Edward Drenning, his special administrator, and the court, on June 8th, 1868, made a decree that there was due to Todd at his death, as an annuitant under said will, $7,680.04, that that sum was a lien on said "No Mistake" plantation, against all liens created thereon since the death of Dick, and that said land be sold to pay that sum. It was sold, by the same description as in said conveyance to James D. Partee, to said Hudson and Ewing, on April 15th, 1878, they being then the owners of the decree in the suit, and they received a deed of that date therefor. In 1871 James D. Partee, as owner of the land, had paid a part of the Drenning decree. In February, 1877, Drenning was paid the balance by Robert G. Hudson and assigned the decree

to him, under an order of the Chancery Court, the assignment being for the benefit of Benson, Hudson and Ewing. Afterwards Hudson and Ewing acquired all the interest of Benson therein.

Hudson and Benson, and Charles C. Ewing, individually and as administrator of S. S. Ewing, and Drenning, as executor of Stewart and as administrator of Todd, were made parties to the supplemental bill in this suit. That bill attacks the validity of the Drenning decree and claims an account of the rents and profits of the land. The parties defendant having put in answers, to which there were replications, the court ordered that the controversy as to Hudson and Ewing and Drenning proceed separately.

On the 29th of November, 1880, the court made a decree setting aside the deeds under which Hudson, Benson, and Ewing obtained title, and decreeing that the deed of April 15th, 1878, to Hudson and Ewing, on the sale under the Drenning decree, was subject to the right of redemption of the appellants as junior encumbrancers, under the original trust deed of November 19th, 1866; that Hudson and Ewing were entitled to be reimbursed what they had paid to Drenning in purchasing his decree, with interest, that amount being $9,391.23, paid February 5th, 1877, and being a paramount lien on the lands in controversy; that Hudson and Ewing were entitled to be reimbursed what they had paid for taxes, and the value of all improvements of a permanent character put on the lands by them, and repairs, but were responsible for a reasonable sum annually for the use and occupation of the lands up to January 1st, 1881; that for the balance due them on an accounting they should have a lien on the lands superior to that of the appellants; that the balance, if any, due by them should be deducted from the amount due them on account of the Todd legacy; that the appellants were entitled to foreclose their trust deed and sell the land subject to such prior claim of Hudson and Ewing; that an account be taken by commissioners as to the amount due to Hudson and Ewing on the Todd legacy decree, and for taxes paid, and as to the fair rental value of the lands during the time they had occupied

and cultivated or leased the same, and interest on such sums from the time they would usually become due and payable, and of the improvements and repairs put on the lands by Hudson and Ewing, "and interest on the value of such portions thereof, from the time of payment or making said repairs and improvements, as may have directly contributed to the enhanced rental value of said lands;" that, in estimating the fair rental value of the lands, the commissioners should inquire what they would have brought in money, if leased together or separately to a solvent lessee or lessees, on the usual or customary terms of leasing such lands as entire plantations or an entire plantation, without reference to any system of underletting pursued by Hudson and Ewing, with as well as without the improvements claimed for by them; and that for all improvements and repairs which directly contributed to enhance the rental value of the lands, the commissioners should allow the original fair cash value and interest from the date at which they were made or furnished, and for all other improvements which enhanced the permanent value of the lands, their actual value at the time of taking the account,

On the 24th of November, 1881, the commissioners made their report. It is set forth in the record, but the account annexed to it and the testimony taken by the commissioners are not set forth. The result was, that they found due to the appellants by the appellees $8,865.99, and to the appellees by the appellants $37,697.92, and that the balance due to the appellees was $28,831.93. The appellants excepted to the account and the report by 19 exceptions. Thereafter the exceptions were heard by the court, and it filed an opinion, which states that the account is not in accordance with the directions of the court or the equities between the parties. It then proceeds: "I have examined and re-examined the account filed by the defendants, and have maturely considered the testimony on both sides, and have arrived at conclusions which I am satisfied meet the equities on both sides as nearly as can reasonably be reached." It then states conclusions of fact on which the rent for 1877 is fixed at $1,000. It then sets forth certain improvements which the defendants made in 1878, and states that they charge there-

for $3,199.37, claiming that these improvements were necessary and enhanced the rental value of the premises; but it says that the improvements "ought not to have been considered as constituting part of the rents," but must be considered "as adding to the permanent value of the lands." It then says: "I have closely examined the account, and, making a liberal allowance for the cash value of the same on the 1st of January, 1881, when the same were surrendered to the receiver, the sum of $2,053.50 is all that should be allowed," with interest from January 1st, 1881. The opinion then sets forth other improvements which the defendants made in 1878, and states that it was claimed they "were necessary and enhanced the rental value of the place, and should be estimated at their original cost and interest;" but it says that the value of those improvements consisted "mainly in their permanency, which should be estimated at their cost value when the property was surrendered, but, as it did contribute to some extent to the rental value for that and succeeding years" during the defendants' occupancy, $4,897.35 was allowed, "at a fair estimate" under that rule, as the value of those improvements, being "more than the permanent value and less than the cost." The rent for 1878 was fixed at $1,500. Deducting from the $4,897.35 the rent for the two years, $2,500, left $2,397.35, with interest from January 1st, 1879. The opinion then states what improvements the defendants made in 1879, that they were "of the same character with those erected in 1878," and that they amounted, "at an estimate made under the rule above stated," to $2,997.68, "from which take the sum of $2,500, as estimated, as a reasonable rent for that year," which leaves to be allowed $497.68, with interest from January 1st, 1880. The opinion then states that the repairs made in 1880 were small, but there were several items charged for improvements made in 1878, 1879 and 1880, not before stated, and which could not be well stated, except as a whole. It then considers at length sundry items, and allows some and disallows others and reduces others, and allows for the items, "all taken together, including improvements made in 1880," $3,655.16, and deducts from that $3,000, as rent for 1880, leaving $655.16, with interest from January 1st, 1881. On

the rendering of that opinion, it was ordered, by consent of parties, that, the opinion and the schedule attached to it (which was a statement of the items and amounts allowed in the opinion) should "be filed and treated as part of the record in the cause," and that the court might "by order, without reference to a commissioner, ascertain and fix the several amounts, as well as the aggregate sum due to the defendants Hudson and Ewing," under the decree of November 29th, 1880.

Thereupon, on the 18th of February, 1882, the court made a final decree. That decree states that the case was heard on the exceptions to the report of the commissioners; that the court, being of opinion that said report does not conform to the decree of November 29th, 1880, orders "that said report and the account therewith presented be set aside," and, "after argument of counsel, proceeding to the decision of the several questions of law and fact involved in the cause," adjudges that there is "due to the defendants Hudson and Ewing, under the judgment and findings of the court on said exceptions, on account of the Todd legacy decree," $12,365.77, and on account of the taxes paid on and by said defendants on the lands, $1,567.44, and that, "after ascertaining and crediting the amount due for reasonable rents" of the lands, "there is a balance due to the said defendants, on account of improvements, repairs and betterments," of $6,309.60, making a total sum due them of $20,242.83, with interest from that date. The decree then finds the amounts due to the several plaintiffs on their notes, being an aggregate of $47,136.06, with interest from that date, and adjudges that the plaintiffs are entitled to redeem the lands, and that on their paying within sixty days, to the defendants, the $20,242.83, with interest, they should be substituted to their rights as senior encumbrancers on the lands, and might enforce payment thereof by a sale of the lands; that, if the plaintiffs should not pay that sum, then the lien of the defendants and that of the plaintiffs should be enforced, and the lands should be sold, and out of the proceeds the amount so due to the defendants should first be paid. From this decree the plaintiffs have appealed.

The only questions presented by this appeal are as to the

allowance in respect of the Drenning decree, and as to the allowances for improvements and repairs and the charges for rent.

It is contended by the appellants that, under the will of Dick, the annuity legacy to Todd and his wife was not a charge on the plantation devised to Mrs. Partee, but was only a personal claim against her, to be enforced by proper proceedings for the forfeiture of the land, on a breach of the conditions specified in the will. The argument made is, that the penalty imposed by the will, of loss of the property in case of non-compliance with the conditions, shows that the testator did not intend to create a lien. But we are of opinion, that, taking the whole will together, a lien was created. The reference to the prior legacies given in money and not charged on any particular fund, of which there are many, shows that there must have been some prior legacies in money which were charged on a particular fund, and the fact that no other legacies in money but those which Mrs. Partee is to pay, as conditions on which the plantation is given to her, are given payable by any person as conditions on which property is given to such person, and that there are no other legacies in money which can answer the description of legacies in money "charged" on a "particular fund," all combine to furnish persuasive evidence that the legacies which Mrs. Partee was to pay were a lien on the plantation. The intention of the testator seems to be clear, and the plantation is not inappropriately called a "fund." Nor can the lien or charge be limited to the 6,000 acres of land. The conditions attach to the entire bequest, consisting of two items. They apply to the legacies to the three Calhoun children and to the annuity legacy to Christopher Todd and his wife; and the subsequent provision as to the times when Mrs. Partee may pay the several legacies to the Calhoun children, on condition that she pays them annually interest on such legacies after she comes in possession of the plantation, shows that that plantation is given to her on condition that she pays those legacies, and, if so, such annuity legacy must be in the same category. *Birdsall* v. *Hewlett*, 1 Paige, 32 ; *Harris* v. *Fly*, 7 id. 421 ; *Loder* v. *Hatfield*, 71 N. Y. 92, 97.

It is further contended that the Drenning decree, which was made June 8th, 1868, was barred, as to its lien, by the Mississippi statute of limitations, when it was purchased by Hudson for himself and Ewing and Benson, in April, 1877. The statute relied on is article 15 of chapter 57 of the Revised Code of Mississippi, of 1857, page 401, in these words:

"No judgment or decree rendered in any court held within this State shall be a lien on the property of the defendant therein for a longer period than seven years from the rendition thereof."

It is plain, we think, that this statute applied only to a judgment or decree rendered *in personam* against a defendant, for the recovery of so much money, and which became a general lien on the property of the defendant in the judgment or decree by virtue of another statutory provision, such as article 261 of chapter 61 of the same Code, page 524. Article 15 of chapter 57 has no reference to such a decree as the Drenning decree here, one establishing and enforcing a specific lien on devised property, created by a will, the decree being made in a suit in chancery brought for that especial purpose. The decree adjudges that the amount found to be due was made by the will of Dick a lien and charge on the plantation devised to Mrs. Partee, and decrees that the plantation stand charged with the payment of that amount, against all liens created thereon by the defendants in the suit since the death of Dick. The decree adjudges, it is true, that the defendants pay to the plaintiff the sum so found due, within thirty days, and that, in default thereof, enough of the plantation be sold to pay such sum. But no execution is awarded against the defendants as on a personal judgment, nor is there any provision for a decree for a deficiency. It was held in Mississippi, in *Cobb* v. *Duke*, 36 Miss. 60, in 1858, that a court of equity had no jurisdiction to make a decree *in personam*, for a deficiency on a bill to enforce a vendor's lien on land, or on a bill to foreclose a mortgage. The same principle applies to the lien in question here. The decree did not create a lien, but merely gave effect to the lien and charge which the will created. In a decree *in personam* for the recovery of money, the statute provided for a lien on

all the property of the defendant in the county; but this decree affected only the specific property in question, and, as to that, related back and overreached all liens on it since the death of Dick, while a judgment *in personam* became a lien only from the time it was rendered.

The bill filed by Todd to enforce his lien made defendants only William B. Partee and his wife. Bowman, the trustee in the appellants' trust deed, was not made a party. But, the will of Dick was proved and recorded in Yazoo County, and the appellants, claiming under Mrs. Partee, by a subsequent deed of trust, took the land subject to the lien and charge created by the will. The appellants aver, in their original bill, that a letter was written by Bowman, the trustee, two days after the deed of trust was made, to the appellants' attorneys in New Orleans, in a copy of which letter annexed to the bill it is stated, as a result of an examination of the records of Yazoo County, with the view of ascertaining what liens or encumbrances there were on the property of Mrs. Partee, that, under the will of Dick, from whom the property was derived, there was an annuity of $1,000 to be paid to one Todd during his lifetime. The only effect of the omission to make Bowman a party to the suit, was to leave the title of a purchaser under the decree in the suit subject to the right of the appellants, as junior encumbrancers, to contest the validity of the prior lien, and to redeem the property. This right has been accorded to them.

The appellants also claim, that there should be an abatement of a portion of the amount paid by the appellees to Drenning, to the extent of Mrs. Partee's distributive share in that amount, as a part of the estate of Christopher Todd, her father. In February, 1877, when Drenning received payment of the balance due on the decree, he was the legal owner of the decree. He had not then been made a party to this suit. Mrs. Partee had no claim in respect of any money due on the decree, other than such claim as she had to her proper share of the entire estate of her father, in due course of its administration. When the decree was purchased by the appellees, no claim of Mrs. Partee was attached to or impressed upon it, or the

moneys due or paid on it. She had no title to any specific part of the uncollected legacy, and could not interfere with its collection or administration. When her share in her father's estate should ultimately come to be ascertained, she might, if still owning the plantation and interested to free it from the charge of the legacy, set off against the decree the amount coming to her from the general estate. But, in the absence of any right, on her part, to any specific share of the legacy, there was nothing to affect or diminish or extinguish or merge the amount of the charge on the plantation. The Todd estate must be left to its due course of administration, and cannot be interfered with or administered in this suit.

The only material questions remaining are those connected with the allowances for improvements. In a decree made by the court below, in this suit, on November 20th, 1879, on a hearing on exceptions to the answer of Hudson and Ewing, it was adjudged that they, claiming title to a part of the property in controversy under a trust deed executed by Nelson, a defendant in the original bill herein, on the 15th of April, 1873, "prior to any process, publication, or appearance in this cause by said Nelson, are not estopped as to said property by the lis pendens, or the proceedings heretofore had in the cause, from answering the original bill," but "are proper parties defendant to the said original bill, as having a substantial interest in the original controversy." The title of Nelson, as a support to any title of the appellees to the land, was destroyed by the decision as to the Stewart judgment. The original bill herein was filed April 1st, 1873. Nelson was made a defendant to it. Process of subpœna was issued against him July 8th, 1873, but was not served. On November 10th, 1873, on an affidavit that Nelson resided in Tennessee, an order of publication against him was made. He appeared on the 30th of January, 1874, and answered on the 11th of February, 1874. Meantime, on the 15th of April, 1873, Nelson made to Short the deed of trust before mentioned, on a sale under which the appellees purchased the land, in February, 1877. The supplemental bill was filed May 27th, 1879, after the appellees had acquired all their titles. They were made parties to it and were served with process, Hudson

June 30th, 1879, and Ewing July 4th, 1879. They admit, in their answer, that, at the sale under the Dreming decree, on the 15th of April, 1878, one of the attorneys for the appellants appeared and asserted some claim in behalf of the appellants, in the hearing of Hudson. There is nothing more in the record on that subject, and just what the assertion of claim was or to what extent does not appear. Their answer alleges that " they purchased the property in good faith, and went into the possession of the same, believing they had a good title to the same and could hold it against the claims of all the world, and without any knowledge whatever of the claim of complainants or of this suit, and that they paid, including the Todd decree, the full value of all the property purchased by them in its then bad and dilapidated condition, and have since enhanced the value of the same very greatly by putting upon it permanent and valuable and not ornamental improvements; " and " that they are entitled to pay, in case they should be adjudged not to have the title to said property, for the valuable and permanent and not ornamental improvements they have put on said property, up to the time they were served with notice in this case, or, if not entitled to pay for all said improvements up to that date, they are for all said improvements up to the time "*of said notification on April 15th, 1878. The answer also insists on the validity of the title of the appellees. By consent of parties and the order of the court made in February, 1880, they were allowed to remain in possession of the land for the year 1880, on giving a bond to account for the fair rental value for that year, if the court should finally decide that they should account for said rent. As has been seen, they were allowed for some improvements to the end of 1880. They entered into possession of the land January 1st, 1877, and surrendered possession to the receiver in this suit January 1st, 1881.

It is manifest that the claim for allowances for improvements, set up in the answer, is intended to be based on the provisions of the statute of Mississippi, Revised Code of 1871, chap. 17, article 4, § 1557, which enacts that " it shall be lawful, in all cases, for the defendant in ejectment, or in an action for mesne profits, to plead the value of all permanent, valuable and not

ornamental improvements, made by the defendant on the land, or by any one under whom he claims, before notice of the intention of the plaintiff to bring the action, giving notice, with his plea, of the character of the improvements, and the value thereof; and, if such improvements shall exceed the value of the mesne profits and damages, the jury shall find the actual cash value of such improvements, the value of the mesne profits and damages, and also the actual cash value of the land, without the improvements, and the defendant shall have a lien upon the land for the difference between the value of the mesne profits and the value of the improvements so found; . . . but no defendant shall be entitled to such compensation for improvements, unless he shall claim the premises under some deed or contract of purchase, made or acquired in good faith."

The Supreme Court of Mississippi interpreted this statute, in 1876, in *Cole* v. *Johnson*, 53 Miss. 94, in a suit in chancery brought by a person who had bought lands at a void probate sale, and paid for them and put valuable improvements on them, to restrain an ejectment suit against him, and to have an account taken of the rents and profits, and of the improvements and purchase money, the latter having been applied to pay the debts of the estate, and to set them off against each other, and charge on the land the balance due the plaintiff. Such relief was granted. It was urged for the defendants that, as the defects in the probate proceedings were patent on the record, by inspection, the plaintiff was not a purchaser in good faith, and did not pay his money in good faith. The court held that it was sufficient if the money was "genuinely paid," without any knowledge or suspicion of fraud, the item "good faith" being used in contradistinction to "bad faith;" and that the expressions as to "good faith" in § 1557 did not import that the claim to compensation for improvements could not be maintained if the purchaser could, by any possible research, have discovered the invalidity of his title, and meant nothing more than an honest belief on the part of the purchaser that he was the true owner. The court adopted the rule stated in *Green* v. *Biddle*, 8 Wheat. 1, 79, that a "bonæ fidei possessor" of land is one "who not only supposes himself to be

the true proprietor of land, but who is ignorant that his title is contested by some other person claiming a better right to it;" and that, after such occupant has notice of such claim, he becomes " a malæ fidei possessor." It further said: " Our view is, that, in order to deprive the occupant of land under color of title, of the value of permanent improvements erected thereon, there must be brought home to him either knowledge of an outstanding paramount title, or some circumstance from which the court or jury may fairly infer that he had cause to suspect the invalidity of his own title, but that this cannot be inferred merely because it could have been demonstrated by the records of the county." Speaking of " *crassa negligentia*," it added: " Where the purchase is made under circumstances which would warrant the imputation of such negligence to the purchaser, as if, for instance, a deed was received, without inquiry, from a mere stranger to the land, who had neither possession thereof nor any actual or apparent claim thereon, the claim of being a *bona fide* purchaser might well be rejected. But we do not think that such imputation can ever be predicated of a judicial sale because of defects in the record, where the land has been bought by a person disconnected with the proceedings, and with no actual notice or suspicion of the irregularities contained in them."

The Circuit Court, it is clear, found, in this case, that the appellees acquired their alleged title in good faith, under the rule thus established. The evidence is not in the record, and must be regarded as sufficient to support such finding. It is shown that the appellees purchased under a tax title in January, 1876, went into possession January 1st, 1877, purchased the Drenning decree February 5th, 1877, purchased at the sale under the deed of trust from Nelson to Short February 19th, 1877, and purchased at the sale under the Drenning decree April 15th, 1878. We do not think that the notice, whatever it was, given at the sale of April 15th, 1878, was sufficient to charge the appellees with *mala fides*, and that there was nothing amounting to the " notice " specified in the statute, until the process under the supplemental bill was served on the appellees.

The only questionable period left open is that which re-

mained until the close of 1880. The testimony on which the Circuit Court acted is not before us. It is plain, from the opinion of the court, that, from the testimony it had, it found that the improvements on the plantation, which was a cotton plantation, and the facilities for preparing the cotton crop for market, were dilapidated when the appellees took possession; that the improvements made, and the clearing of more land, in 1878, added 50 per cent. to the rent for that year; and that there was thus constituted a permanent fund for increased rent for after years, so that, with the additional improvements made in 1879, the rent for 1879 was equal to the rent for both of the two preceding years, and the rent for 1880 was increased $500 over that for 1879. The year 1879 must be considered as a whole from January to January. It is impossible to tell, as the proof is not before us, how much was allowed for improvements made in 1880, as the fencing allowed for 1880 is stated in the opinion to have been mostly made in 1878 and 1879, and it states that there are several items of charge for improvements made in 1878 and 1879 and less in 1880, which cannot well be stated otherwise than as a whole. As we have not the testimony which the Circuit Court had, and it appears to have been carefully and minutely considered by that court, and the appellees appear to have remained in possession during 1880 by consent and under the sanction of an order of the court, we cannot arrive at the conclusion, on this appeal, that the amount allowed ought to be reduced. It is not to be forgotten that the appellants were seeking merely a sale of the land by a resort to a court of equity, and that, while they had the benefit of some of the improvements in increasing rents, they had the benefit of the material and permanent ones in the increased value of the lands for the purpose of sale, including the increased area of cultivated land. In such a case there is no inflexible rule that the allowance for permanent improvements shall not exceed the rental value during the occupancy.

The present case has an analogy to that of a purchaser at a foreclosure sale, who makes valuable improvements in the belief that he has acquired an absolute title. He is entitled to be paid for them if the premises are redeemed. 2 Jones on Mort-

gages, § 428. Where a party lawfully in possession under a defective title makes permanent improvements, if relief is asked in equity by the true owner, he will be compelled to allow for such improvements. 2 Story Eq. Jur. § 1237, note 1 ; *Bright* v. *Boyd,* 1 Story, 478, and 2 id. 605 ; *Putnam* v. *Ritchie,* 6 Paige, 390 ; *Williams* v. *Gibbes,* 20 How. 535.

All the questions raised by the counsel for the appellants have been examined and considered, but we have not thought it necessary to comment on others than those above reviewed. Upon the whole case we are of opinion that

*The decree of the Circuit Court must be affirmed.*