## ANDERSON *v.* REID.

BONA FIDE PURCHASERS; EQUITY; COMPENSATION TO EVICTED OCCUPANT FOR IMPROVEMENTS.

1. One who buys real property without examination of the land records which plainly show the infirmity of the title which he is buying, and that the true title is outstanding in some one else, can not be regarded as a *bona fide* purchaser in good faith as against the lawful owner.

2. When an occupant of land in good faith has been evicted in eject-
ment at the suit of the lawful owner, and there has been no
claim by the latter for *mesne* profits, the evicted occupant can
not maintain a bill in equity against the lawful owner to
recover compensation for improvements made during such
occupancy, and enforce the same as an equitable lien against
the property, where there has been no fraud or negligence on
the part of the lawful owner whereby the occupant was lured
into making the improvements.

No. 859. Submitted December 8, 1898. Decided January 3, 1899.

HEARING on an appeal by the complainant (specially al-
lowed) from an interlocutory decree of the Supreme Court
of the District of Columbia sustaining a bill in equity by a
party evicted from land by ejectment, to have an equitable
lien declared in his favor against the land for the value of
improvements erected by him.    *Reversed.*

The petition for the allowance of the appeal in this case set
forth in substance that petitioner, Anderson, had recovered a
judgment in ejectment against one John Reid for the prop-
erty described in these proceedings; that he had been placed
in possession of said property by a writ of *habere facias*, and
that thereafter said Reid had filed a bill of complaint in
equity in the Supreme Court of the District, against peti-
tioners, Anderson and Mackey, alleging that he was a
*bona fide* purchaser of said real estate and had made
certain improvements, consisting of a dwelling house,
etc., on said land in like good faith, and he prayed the
court to declare a lien on the land for the value of said
improvement, which he valued at $3,000; that petition-
ers had demurred to said bill, but the same had been
overruled and petitioners required to answer, which they
did, reserving their objection by demurrer, etc.    That
upon the said answers, which denied all alleged equities,
issue had been joined, testimony taken, and case having
been heard by the court, a decree had been passed against
petitioners referring the cause to the auditor for an account-

ing. The substance of the pleadings and testimony and the decree in full were set forth in the petition. The petition then averred that the taking of said account would involve considerable delay and expense, quite out of proportion to the amount involved; that many witnesses would be required *pro* and *con*, as to value, etc., and if the case be appealed to this court, a very bulky volume would be made, whereas the record as it then stood was quite inconsiderable. That petitioners denied the jurisdiction of said court in equity to make any money allowance to a defeated defendant in ejectment for improvements, upon a bill filed by him for that purpose, and especially that it had no jurisdiction to declare a lien in his favor against the land of the successful plaintiff for the costs of said improvements. That said reference to the auditor could have no effect save to delay and harass petitioners and put them to great and useless trouble, inconvenience and expense, since any decree which should grant to said Reid a money allowance for said improvements or allow him a lien therefor, would be without authority of law, according to the well-settled decisions of courts of equity. That petitioners were advised that it was doubtful whether they have any absolute right to appeal from said decree to this court, and in order therefore that the rights of both parties might be protected and the main question in the case—the right of the complainant to maintain his bill at all—might be speedily determined, petitioners prayed that an appeal from said decree might be allowed by this court.

A brief was filed on behalf of the appellant in support of the petition, citing the cases of *Baker* v. *Cummings,* 4 App. D. C. 230, and *Summers* v. *Morrison,* 13 App. D. C. 161.

The appeal was allowed on this petition.

The facts are sufficiently set forth in the opinion.

*Mr. Franklin H. Mackey* for the appellant:

1. A defeated defendant in ejectment can not maintain a bill in equity to recover the value of improvements even though made in good faith, when he alleges no fraud. Story's Eq. Jur., Sec. 799*a*, 799*b*, 1238; Pom. Eq., Sec. 1241 and note. Sugden on Vendors, Ch. 22, Sec. 1, p. 55: 14 Ed. 748.

2. The doctrine which it is claimed *Bright* v. *Boyd,* 1 Story Rep. 479, decided, has been repudiated by Judge Story in his work on Equity Jurisdiction. Moreover, it was not necessary to decide in that case that a defeated defendant in ejectment might recover for improvements without alleging fraud, for upon the plain facts of the case the successful plaintiff was estopped in equity upon the ground that he had received the benefit of the purchase money paid by the defendant for the land, and Judge Story practically decided the case on that doctrine. His statement in the opinion that there was no authority in this country or England against the doctrine that a defeated defendant in ejectment might recover in equity for improvements *bona fide* made and that he would be "most reluctant to be the first judge to lead to such a decision," was clearly made in forgetfulness of the fact that he himself had been "the first judge" in this country to make " such a decision," at least so far as the reported cases disclose. The case is that of *The Society, etc.* v. *Wheeler*, 2 Gall. 105, in which Mr. Justice Story is reported as saying: "It is difficult to perceive the equitable or moral obligation which should compel a party to pay for improvements that he had never authorized and which originated in a tort. . . . No such equitable right is recognized in the law ; and indeed it has been deemed so far destitute of moral obligation, that even an express promise to pay for improvements made by a person coming in under a defective title has been held a *nude pact.*" Pp. 142, 143.

The next case to decide against the doctrine was *Morris*

v. *Terrell*, 2 Rand. (Va.), 6–13, decided in 1823, and the next
*Winthrop* v. *Hunington*, 3 Ohio, 327, decided in 1828; this
.was followed in 1830 by *Nelson* v. *Allen*, 1 Yerger (Tenn.),
383. Then came the leading case of *Putnam* v. *Ritchie*, 6
Paige (N. Y.), 390, decided by Chancellor Walworth in 1837.
It was this last cited case that Judge Story referred to in
*Bright* v. *Boyd*, and clearly misquoted Chancellor Walworth
when he credits him with saying "that he could find no
case in England or America where the point had been ex-
pressed or decided either way," for no such expression can
be found in the report of that case. What Chancellor Wal-
worth did say was quite the contrary, viz. that he had not
been able to find "any case either in this country or in
England, wherein the court of chancery has assumed juris-
diction to give relief to a complainant, who has made im-
provements upon land the legal title to which was in the
defendant, when there has been neither fraud or acquies-
cence on the part of the latter after he had knowledge of
his legal rights."

*Union Hall Asso.* v. *Morrison*, 39 Md. 281, relied upon in
the court below, was not the case of a defeated defendant in
ejectment at all. It was the case of a party who had been
ousted by the sheriff under a writ against a third party.
The complainant in the bill in that case had never had a
day in court, and the defendant in the bill was clearly
estopped from claiming the improvement, for he had lain
by and permitted them to be made without objection, one
of the very grounds upon which equity grants relief. Not
a single one of the cases cited by the learned judge deliver-
ing the opinion in the Maryland case support the doctrine
sought to be established in the case at bar. Thus *Thomas*
v. *Thomas, Exr.*, 16 B. Mon. 421, was a suit brought upon
covenants of warranty. In *McKelvey* v. *Armour*, 10 N. J.
Eq. 115, and the case cited the defendant had stood by and
"saw the complainant progressing from day to day with

these improvements," and *Bright* v. *Boyd*, we have already seen, was repudiated by Judge Story in his Equity Jurisprudence. *Valle's Heirs* v. *Flemming's Heirs*, 29 Mo. 152, *Bell* v. *Barnett*, 2 J. J. Marsh, 516, and *Hatcher* v. *Briggs* were all cases where the holder of the equitable title filed the bill and was compelled "to do equity" by paying for improvements *bona fide* made by the legal title holder before relief would be granted him—a doctrine which no one disputes.

The American cases are numerous where the jurisdiction of chancery in a case of this sort has been denied; besides those above cited are *Parsons* v. *Moses*, 16 Iowa, 440; *Effinger* v. *Hall*, 81 Va. 94; *Frick* v. *Safe Deposit Co.*, 183 Pa. St. 271; *Woods' Exrs.* v. *Krebbs*, 33 Gratt. 689; *Billings* v. *Hall*, 7 Calf. 1–8; *Brazemore* v. *Davis*, 55 Ga. 519, and *Eppings* v. *Tunstalls*, 57 Ga. 269, both of these cases disapproving of the *obiter* in *Davis* v. *Smith*, 5 Ga. 289, cited by the appellee.

In England the law is well settled. Besides Sugd. Vend. *supra*, see *Needler* v. *Wright*, decided as early as 13 Car. 2, and reported in Nelson's Ch. Rep. 87; *Atty. Genl.* v. *Baliol College*, 9 Mod. 407, 411; *Nicholson* v. *Hooper*, 4 Mylne & Craig, 178. But even if the question were a doubtful one elsewhere, the Supreme Court of the United States has settled it for this jurisdiction. See *Williams* v. *Gibbs*, 20 How. 535; *Canal Bank* v. *Hudson*, 111 U. S. 66, 83; *Searl* v. *School District*, 133 U. S. 561; *Carver* v. *Astor*, 4 Pet. 1, 101.

3. Moreover, the appellee is not a *bona fide* improver. His allegations in his bill to that effect are denied by the answer, and so far from overcoming the force and effect of the answer by two witnesses, he is the only witness in his behalf, and in his testimony, if he had the title examined at all, clearly shows that he had notice of the defect in his title, viz., that it was a tax title and that he had no evidence of any adverse possession by those under whom he claimed. He admits the property had been *vacant* for over a year when he bought it.

*Mr. Jackson H. Ralston* and *Mr. Frederick L. Siddons* for the appellee:

1. It is within the power of the court of equity to grant relief to the extent of his improvements to the defeated party in ejectment, and that such relief may be granted when the defendant in ejectment himself actively seeks the relief. Upon the direct point in issue there is an extreme paucity of decision. The appellant has not cited any American cases whatever in which his contentions have been directly sustained, even such cases as might appear to be in point on examination proving not to present the exact question, or, as in the case of *Winthrop* v. *Huntington*, 3 Ohio, 27, the theory of the party seeking relief being entirely distinct from that adopted in the present case, and therefore presenting another question.

The principal case upon which appellee relies is that of *Bright* v. *Boyd*, 1 Story, 478; receiving at that time a thorough discussion and afterwards reviewed by the same judge in 2 Story, 605, he maintaining the opinion first rendered and further elucidating the argument. In this case the ejected party sought relief to the extent of the value of his improvements, precisely as is desired here. It was followed in *Union Hall Association* v. *Morrison*, 39 Md. 281; the bill in this case being framed as to its averments and prayer for relief upon the latter case. The case at bar can not, from any standpoint of principles, be distinguished from *Bright* v. *Boyd* or *Union Hall Association* v. *Morrison*; and if the reasoning upon which these cases is founded finds support in natural justice, the appellee must receive the relief prayed for.

When a defendant in ejectment has taken his property, as in this case, without notice of any defect in his title, has put upon it improvements many times multiplying its value, and is thereafter ousted, he should in justice receive, as nearly as may be, the money he has expended to enrich another man.

2. Of the American cases cited on behalf of appellants to maintain their position, the first, that of *Parsons* v. *Moses*, 16 Iowa, 440, is not in point, the action being one brought under an Iowa statute and dependent for its decision upon the construction of that statute. It can not, therefore, be cited as an authority upon the common law. In the case of *Putnam* v. *Ritchie*, 6 Paige, 390, Chancellor Walworth, without citing any other case, at the same time indicated that only defendants could obtain the relief asked. In *Williams* v. *Gibbs*, 20 How. 538, the Supreme Court, as an *obiter dictum*, says that "courts of equity, it would seem, do not grant active relief in favor of a *bona fide* purchaser making permanent meliorations and improvements by sustaining a bill brought by him against the true owner after he has succeeded in recovering the property at law." The question was not before the court and no decided opinion expressed; and we have no information as to the judicial tendency, when the question will be presented. Similarly in *Canal Bank* v. *Hudson*, 111 U. S. 67, and *Searl* v. *School District*, 133 U. S. 561, wherein it is indicated that when aid of the court of equity is sought by the real owner, allowance for improvements will be made, the present question was not presented to the court. So far, therefore, as any real expression of opinion is concerned, the direct point at issue being before the court, there can scarcely be said to be a preponderance of authority either way, and we are left to consider the matter from the standpoint of reason. *Davis* v. *Smith*, 5 Ga. 289. Even in one of the cases cited by the appellants (*Effinger* v. *Hall*, 81 Va. 103), the court recognizes that the old rule is now departed from and in certain cases allowance made. That the so-called old rule was evil is not questioned by the Virginia court; while in *Wood* v. *Krebbs*, 33 Gratt. 690, it is stated that a statute allowing improvements was passed because of the disagreement in the authorities.

The failure of Judge Story in his Equity Jurisprudence

to recognize the rule of *Bright* v. *Boyd* results from the fact that the first edition was published in 1835, while the case of *Bright* v. *Boyd* was decided in 1837, and the citations from Story's Equity relied upon by appellant are the annotations made by Bigelow, its latest editor. In 3 Parsons on Contracts, \*221, a reputable legal writer sustains the case of *Bright* v. *Boyd.* We therefore find a division among the text writers, while we should not overlook the fact that although the Supreme Court of the United States has repeatedly had before it the case of *Bright* v. *Boyd*, particularly, however, upon the question of allowance to defendants in equity of the value of· their improvements, it has never yet criticised or denied the authority of the case.

3. The attention of the court is called to *Thomas* v. *Thomas' Executors*, 16 B. Monroe, 241, as a case directly in point, and to the cases of *McKelway* v. *Armour*, 11 N. J. Eq. 118; *Vallee's Heirs* v. *Fleming's Heirs*, 29 Mo. 152, and *Hatcher* v. *Briggs*, 6 Oregon, 31, as in their reasoning directly useful, and as sustaining the rule announced in *Bright* v. *Boyd.*

4. Appellants' counsel apparently denies the right of Reid to rely upon the examination of title made by him as testified, and insists that he could not be a *bona fide* purchaser. Upon this point attention is called to *Thomas* v. *Thomas' Executors*, 16 B. Monroe, 421, as showing that a purchaser is chargeable with the defects only in his own deed, not in prior defects of which he could not be presumed to have knowledge. Reid comes within the strict rule of *Green* v. *Biddle*, 8 Wheaton, 79, to the effect that "a *bona fide* possessor of land is one who not only supposes himself to be the true proprietor of the land, but is ignorant that his title is contested by some other person claiming a better right to it." It is to be borne in mind that we are only asking for such improvements as were put upon the land prior to Reid's knowledge of Anderson's existence or supposed title and as to which he was a maker in good faith.

Mr. Justice MORRIS delivered the opinion of the Court:

On December 3, 1897, the appellant, Richard P. Anderson, as plaintiff in an action of ejectment, instituted by him in the Supreme Court of the District of Columbia against the appellee, John Reid, as defendant, recovered judgment therein for the possession of a part of Lot 20, in Square 51, in the city of Washington; and that judgment on appeal was affirmed by this court. 13 App. D. C. 30.*. Anderson was thereupon placed in possession of the property. A few months thereafter he executed a deed or declaration of trust as to one undivided half of the property in favor of the other appellant, Franklin H. Mackey, as security for money due by him to the latter for professional services; and for this reason only Mr. Mackey has been made a party to the present suit.

Subsequently Reid, the defeated contestant in the ejectment suit, filed his bill in equity against Anderson and Mackey to procure the allowance to him of compensation for the value of the improvements which he had placed upon the property during the period of his occupancy of it; and after answers filed and testimony taken, the court of equity, holding that the complainant was entitled to his claim for compensation, ordered a reference of the cause to the auditor of the court for the purpose of stating an acconnt between the parties. From this order of reference the present special appeal has been allowed, in order that the law should be determined in reference to the right of compensation for improvements under such circumstances.

From the bill of complaint it appears that in the year 1855, the property had been sold for the non-payment of taxes assessed in the name of Anderson, in whom the title to the property is conceded to have been at that time; and that the complainant Reid purchased in the year 1880 at a judicial sale made by trustees, who, however, had only

---

* See, also, Anderson *v.* Reid, 10 Id. 426.—REPORTER.

the title acquired under the tax deed to sell. There is a claim in the bill on behalf of the complainant that this title had ripened by adverse possession into a good possessory title, or rather that the complainant's information was to that effect; but the facts are not stated upon which the complainant professes to have acted, and it is quite evident from the result of the ejectment suit that the claim was baseless. There is also a claim advanced, which seems to have been advanced also in the ejectment suit, that Anderson had ratified the tax sale by accepting an alleged balance of the proceeds of sale; but it is conceded that the testimony wholly failed to substantiate this contention.

The bill of complaint proceeds to allege that the complainant had no notice of the defects in his title at the time at which he purchased, and no notice of any adverse claim by Anderson; and that, relying upon the information which he had received in regard to the title and in regard to the ratification of the tax sale by Anderson, he had purchased the property, and within six months thereafter he had commenced the erection of a building upon the lot, which previously thereto appears to have been vacant ground, below the grade of the adjacent street and frequently covered with water. He also claims that he paid $134\frac{40}{100}$ for the lot, or at the rate of ten cents a square foot; and that he expended about $3,000 in the improvements; also that he had paid the taxes since 1880; and that Anderson had done nothing in regard to the lot since 1859, either in the way of improvement or in the way of the payment of taxes.

The prayer of the bill was that an equitable lien should be declared upon the property in favor of the complainant to the extent of the value of the improvements placed thereon by him; and that, unless otherwise discharged, the property should be sold for the satisfaction of such lien.

· The answer of Anderson denies the substantial allegations of the bill of complaint or requires strict proof thereof. And it denies especially that he had acquiesced in the tax

sale of 1855 by the receipt of any surplus, or that he had ever received, or authorized anyone to receive for him, any such alleged surplus. It avers, moreover, that the complainant's improvements were not worth more than $750; and that the complainant had been more than compensated therefor by the receipt of rents from the property to the amount of nearly $5,000.

The defendant Mackey adopted Anderson's answer as his own, and stated the ground of his interest in the subject-matter of the suit.

It was developed that the suit in ejectment, in which Anderson recovered possession of the property, was the third in a series of three suits instituted by him. In the first of these, which was commenced in 1884, he obtained judgment, and went into possession of the property in 1885. But somehow the appellee Reid regained the possession in 1887; and Anderson thereupon instituted a second suit in ejectment, which he afterwards dismissed of his own accord on the ground of some informality or irregularity in its institution. Then, in 1896, Anderson instituted the third suit, under which he recovered judgment and the possession of the property, as heretofore stated.

As supposed to bear upon the question now at issue between the parties, the substance of certain testimony given by Anderson in the last ejectment suit is set forth in the bill of complaint. The relevancy of most of this is not apparent to us, but there is one portion of it which may be assumed to be of importance. This portion, as quoted from the bill of complaint, is as follows:

"That after his (Anderson's) return (from Cumberland to Washington in 1873), he lived within four or five blocks of the lot, and went by it frequently, and always thought he had a right to claim the property, and it occurred to him that at the proper time he would appear and take possession of the property, but he waited until he saw a house there; that he knew in 1863 his property had been sold for taxes;

14 Ct. App.—6

that in 1884 he found this plaintiff (the appellee Reid) had built a house thereon, and he saw the plaintiff about it, and in 1885 he commenced his first proceeding to get possession of the property."

It is proper to say that the defendant Anderson in his answer denies the tenor and effect of this testimony as stated by the complainant.

The testimony taken in the cause on behalf of the complainant Reid, which consists only of his own deposition, fails to show that he had caused any examination to be made of the records by any competent person prior to the year 1887, for the purpose of ascertaining for himself the condition of the title. He did have such an examination made in 1887, and that examination disclosed the infirmities of his title. It is true that he states that at the time of his purchase he had "some lawyers," only one of whom is identified, to examine the title for him, and that they pronounced it good. But his testimony in this regard is so vague, inconsistent and contradictory that we can not give any credence to it. If these alleged lawyers were competent persons and actually investigated the records, they must have discovered the defects, which were as patent then as they were afterwards in 1887, when an examination was actually made; and it is not conceivable that they would have reported the title of the complainant to be good. If, on the contrary, they were imcompetent persons, or they did not actually investigate the records, the complainant is chargeable with the result of the employment of such persons. But we think it very clear that the complainant had caused no investigation to be made prior to 1887, for there would have been no necessity for that examination if there had been a previous one. And this is the only testimony to show that the complainant took the usual precaution in such cases for an examination of the records. There is no attempt to adduce any testimony to show any ground for the belief of the complainant, which he alleges in his bill,

that he was purchasing a good possessory title. Nor is there any attempt to support any of the other allegations of the bill by testimony of any kind. Nor is there any proof of bad faith, fraud, or misconduct on the part of the defendant Anderson by which the appellee was misled to his detriment. On the contrary, the testimony of the defendant Anderson tends to show that there was no such action or course of conduct on his part. There is left, however, the inference on behalf of the complainant, that, being apparently a man who did not fully appreciate the requirements of the case, he may have acted in ignorance of the usual course of procedure taken by prudent men upon the purchase of property.

Under these circumstances, two questions arise: (1) Whether the complainant and appellee Reid was a purchaser in good faith of the property in question, and made the improvements placed thereon by him in the honest belief and conviction that he was the true and lawful owner of the property; and (2) Whether a purchaser of property in good faith, who has been evicted in a suit at law by the owner of the paramount and true legal title, can thereafter maintain a suit in equity against the true owner for the value of improvements placed by him upon the property during the period of his occupancy, when there has been nothing in the nature of fraud on the part of such true owner.

1. With reference to the first of these two questions, it is very clear that we should wholly eliminate from our discussion all consideration of the matter of possessory title. There is no showing of any foundation for a belief in the existence of any good possessory title, and no pretense whatever of any proof on that point. The claim is distinctly of a reliance upon a good record title and of information to that effect communicated to the appellee. The question, therefore, is presented, whether a person can be regarded as a purchaser in good faith who, with the records open to him from which he can ascertain the infirmity of the title which

he proposes to buy and the superiority of the title of another person, fails to examine those records and purchases the defective title without examination; or who causes the required examination to be made, but by agents so reckless or so ignorant as that they misrepresent to him the true condition of the records and what they disclose. The latter branch of the question scarcely needs consideration by us, since it is very clear that no examination was ever made. If it had been, it ought to have been easy to produce upon the witness stand some one or more of the " several lawyers " who are claimed to have made it. The real question, therefore, is whether a person who buys property without examination of the records which are open to him and which plainly show the infirmity of the title which he is buying, and that the true title is outstanding in some one else, can be regarded as a purchaser in good faith as against the claims of the lawful owner.

The answer to this question is not difficult. It is the special purpose of registration laws to give notice of prior existing rights to intending purchasers. The public records give constructive notice of their contents, and it is the duty, as it is the general usage, of all persons dealing with the transfer of real estate, to have recourse to such records for the ascertainment of title, if they would be secure in their purchase. Not to do so is to incur the liability of shutting their eyes to the facts which they might have discovered upon examination. They are chargeable with notice where they might have had knowledge, if they had not been unduly reckless or negligent. Now, as was well said in the case of *Tolbert* v. *Horton,* 31 Minn. 578, " want of notice is an essential element of good faith or *bona fides,* as those terms are used in registry statutes and in equity jurisprudence." Or, as the law was stated in the case of *Gregory* v. *Thomas,* 20 Wend. 19, " to say that a man takes in good faith, when he acts with notice, and of course under con-

scious hostility to another who has before taken a similar title, would be a legal solecism."

It is unnecessary to multiply authorities on the point; for the law is clear and well settled. And it is equally clear to us that the proof in the present case brings the appellee within the operation of the law. We can not think, therefore, that the appellee can with any propriety be regarded as a purchaser in good faith; and if he is not a purchaser in good faith, he can not, of course, have the intervention of equity in his behalf.

2. Our conclusion in regard to the first question is sufficient to dispose of this case. But as the second question —whether a purchaser in good faith, evicted at the suit of one holding the true legal title, is entitled to compensation for improvements made by him upon the land during his occupancy in such good faith, when he has not been misled in any way by the action of the true owner—is fairly presented by the pleadings, and is now, as it seems, distinctly presented for the first time in this District, and is likely to recur at any time, we deem it proper to give it the consideration which its importance deserves.

It is well known that the rule of the Civil Law of Rome and that of the Common Law of England on this point are radically at variance with each other; and that the courts of equity, whenever occasion arises for their intervention, follow the rule of the Civil Law, as is their custom also in other cases. The Common Law is sedulous to guard the rights of the lawful owner as against all adverse holders without right, whether they be holders in good faith or mere trespassers without claim of title; and under its provisions all constructions upon land by an adverse occupant become the property of the true and lawful owner just as much as the land itself, of which they are held to have become an integral part. And by the strict letter of that law, the occupant, who has erected them, is not allowed compensation therefor from the true owner. On the other hand,

the Civil Law regarded it as contrary to natural justice that, when an occupant in good faith has made improvements upon land, the lawful owner of the land should receive the benefit of them without just compensation to such occupant. A large number, perhaps a large majority of the States of the Union, have enacted statutes on the subject, and in such enactments have invariably adapted, to a greater or less extent, the principle of the rule of the Civil Law; and such also is believed to have been the result of English statutory legislation during the last quarter of a century.

In courts of equity, whenever the true owner of land has found it necessary, as has not infrequently been the case, to apply to them for the enforcement of his right and title, the rule of the civil law, as we have stated, has always been adopted and administered. But this seems to have been, not on the ground that the courts of equity will necessarily antagonize and repudiate the rule of the common law, but on the ground of the maxim that *he who seeks equity must do equity*; and so they will not lend themselves to the enforcement of a complainant's right, unless upon condition that such complainant will do full justice to the occupant whom he seeks to dispossess.

Now, also, even at the common law, when, in connection with the action of ejectment by the addition of a count for *mesne* profits to the declaration, or in an independent suit for such *mesne* profits, both of which are regarded as applications of the equitable action of *assumpsit*, the lawful owner seeks to recover from the occupant compensation for the detention of the land, as well as the land itself, it is competent for an occupant in good faith to set off against such claim for *mesne* profits, and to the extent of the claim, but no farther, the value of the improvements which he has made during his occupancy. This is settled law.

But the question now raised is, whether, when an occupant in good faith has been evicted in ejectment at the suit

of the lawful owner, and there has been no claim on the part of the latter for *mesne* profits, the evicted occupant may himself maintain a bill in equity against the lawful owner for the recovery of compensation for improvements made during such occupancy, and enforce the same as an equitable lien against the property, when there has been no fraud or fraudulent inducement, or remissness, or negligence on the part of the lawful owner whereby the occupant was lured into making the improvements.

The question is not a new one. It arose in the case of *Putnam* v. *Ritchie*, 6 Paige, 390, before Chancellor Walworth; and that case does not seem to have been the first, although it is usually regarded as the leading case on the subject. In that case, which was decided in 1837, Chancellor Walworth said:

" By the rules of the civil law, the possessor of the property of another who has erected buildings or made other improvements thereon in good faith, supposing himself to be the owner, was entitled to payment for such improvements, after deducting from the value thereof a fair compensation for the rents or use of the property during the term he occupied it (citing some authorities from the civil law). This principle of natural justice has been adopted by the law of England and of this State (New York) to a limited extent, in the action for *mesne* profits; where the *bona fide* possessor of property is permitted to offset or recoup in damages the improvements he has made upon the land to the extent of the value of the rents and profits during his occupancy. . . . If I felt myself authorized to introduce this principle of natural equity into the law of this court further than it has yet been adopted here, I should direct a reference to a master to ascertain the present value of the lot, exclusive of the buildings, subject to the widow's dower, and to the future rents exclusive of her share thereof, and also to ascertain the present value of the buildings subject to the right of dower therein; and should give the defendants the right

to elect, upon the coming in of the master's report, whether they would retain the legal title to the lot subject to the rent and right of dower, and pay to the complainant the value of such improvements, or would release to him their legal estate in the premises upon being paid the value thereof, as thus ascertained, exclusive of the buildings.

"This principle of natural equity is constantly acted upon in this court where the legal title is in the person who has made the improvements in good faith, and where the equitable title is in another who is obliged to resort to this court for relief. The court in such cases acts upon the principle that the party who comes here as a complainant to ask equity, must himself be willing to do what is equitable. I have not, however, been able to find any case, either in this country or in England, wherein the court of chancery has assumed jurisdiction to give relief to a complainant who has made improvements upon land, the legal title to which was in the defendant, where there has been neither fraud nor acquiescence on the part of the latter after he had knowledge of his legal rights. I do not, therefore, feel myself authorized to introduce a new principle into the law of this court, without the sanction of the legislature, which principle in its application to future cases might be productive of more injury than benefit."

The rule so laid down seems to have been recognized or adopted by all the text books. Mr. Justice Story, in his work on Equity Jurisprudence, says (Secs. 1237, 1238):

"Courts of equity have not confined the doctrine of compensation or lien for repairs and improvements to cases of agreement or of joint purchases. They have extended it to other cases where the party making the repairs and improvements has acted *bona fide* and innocently, and there has been a substantial benefit conferred on the owner, so that *ex aequo et bono* he ought to pay for such benefit. Thus where a tenant for life under a will has gone on to finish improvements permanently beneficial to an estate which were

begun by the testator, courts of equity have deemed the expenditure a charge for which the tenant is entitled to a lien. So, where a party lawfully in possession under a defective title has made permanent improvements, if relief is asked in equity by the true owner, he will be compelled to allow for such improvements. So, money *bona fide* laid out in improvements on an estate by one joint owner will be allowed on a bill by the other if he asks for a partition. So, if the true owner stands by and suffers improvements to be made on an estate without notice of his title, he will not be permitted in equity to enrich himself by the loss of another, but the improvement will constitute a lien on the estate.

"In all cases of this sort, however, the doctrine proceeds upon the ground, either that there is some fraud, or that the aid of a court of equity is required; for if a party can recover the estate at law, a court of equity will not, unless there is some fraud, relieve a purchaser or *bona fide* possessor on account of money laid out in repairs and improvements."

See, also, Pomeroy's Equity Jurisprudence, Vol. 3, Sec. 1,241. And the same seems to have been the rule of the English Court of Chancery. Sugden on Vendors and Purchasers, Chap. 22, Sec. 1; *Attorney General* v. *Baliol College*, 9 Modern, 407. See, also, *Nicholson* v. *Hooper*, 4 Mylne & Craig, 179. The same rule has likewise been recognized by the Supreme Court of the United States in several cases. *Williams* v. *Gibbs*, 20 How. 535, 538; *Canal Bank* v. *Hudson*, 111 U. S. 66, 83; *Searl* v. *School District*, 133 U. S. 553, 561.

In the case cited of *Williams* v. *Gibbs*, 20 How. 535, the Supreme Court of the United States, by Mr. Justice Nelson, said:

"Another principle which we think applicable to this case is to be found in a class of cases where a *bona fide* purchaser for a valuable consideration, without notice, has enhanced the value of the property by permanent expenditures, and has been subsequently evicted by the true owner,

on account of some latent infirmity in the title. It is well settled, if the true owner is obliged to come into a court of equity to obtain relief against the purchaser, the court will first require reasonable compensation for such expenditures to be made, upon the principle that he who seeks equity must first do equity.    2 Story's Eq., Secs. 799 and 799*b;* 6 Paige R. 403, 404; 1 Story Rep. 494, 495.

"A kindred principle is also found in a class of cases where there has been a *bona fide* adverse possession of the property tacitly acquiesced in by the true owner. The practice of a court of equity in such cases does not permit an account of rent and profits to be carried back beyond the filing of the bill. 8 Wheat. 78; 27 E. L. & E. Rep. 212; 7 Ves. 541; 1 Ed. Ch. 579. This principle is applicable where the person in possession is a *bona fide* purchaser, and there has been some degree of remissness, or negligence, or inattention, on the part of the true owner, in the assertion of his rights.

"Courts of equity, it would seem, do not grant active relief in favor of a *bona fide* purchaser, making permanent meliorations and improvements, by sustaining a bill brought by him against the true owner, after he has succeeded in recovering the property at law. 6 Paige, 390, 403; 1 Story R. 495; 8 Wh. 51, 52.

"The civil law in this respect is more liberal, and provides a remedy in behalf of the purchaser, even beyond an abatement of the rents and profits for such expenditures as have enhanced the value of the estate; and indeed generally applies the principle in favor of any *bona fide* possessor of property who has in good faith expended his money for its preservation or amelioration; otherwise, it is said, the true owner appropriates unjustly the property of another to himself. Touillier, 3 B., Tit. 4, Chap. 1, Secs. 19, 20."

In the case of *Canal Co.* v. *Hudson,* 111 U. S. 66, Mr. Justice Blatchford, speaking for the Supreme Court, said: "Where a party lawfully in possession under a defective

title makes permanent improvements, if relief is asked in equity by the true owner, he will be compelled to allow for such improvements. 2 Story Eq. Jur., Sec. 1237, note 1; *Bright* v. *Boyd*, 1 Story, 478, and 2 Id. 605; *Putnam* v. *Ritchie*, 6 Paige, 390; *Williams* v. *Gibbs*, 20 How. 535."

In the case of *Searl* v. *School District*, 133 U. S. 533, Mr. Chief Justice Fuller, speaking for the Supreme Court again with reference to the same question, and also with reference to the statutes of the several States which have embodied the principle of the civil law in their legislation, said:

"Courts of equity, in accordance with the principles of the civil law, when their aid is sought by the real owner, compel him to make allowance for permanent improvements made *bona fide* by a party lawfully in possession under a defective title. Story Eq. Jur., Sec. 1237. The civil law recognized the principle of reimbursing to the *bona fide* possessor the expense of his improvements if he was removed from his possession by the legal owner, by allowing him the increase in the value of the land created thereby. And the betterment laws of the several States proceed upon that equitable view. The right of recovery, where the occupant in good faith believes himself to be the owner, is declared to stand upon a principle of nature, justice and equity, and such laws are held not to be unconstitutional as impairing vested rights, since they adjust the equities of parties as nearly as possible according to natural justice."

The deduction to be made from all these authorities is, that the rule of the civil law, although it is conceded to be greatly more just and equitable than that of the common law, has not been adopted in our jurisprudence, except in three cases: (1) At common law or in equity when it is sought to recover *mesne* profits, in which case the occupant in good faith may recoup the value of his improvements to the extent of the rents and profits sought to be recovered; (2) When the true owner comes into equity to enforce his title, in which case he is required to do equity also by the

allowance of the value of the improvements; and, (3) Where there has been fraud, or something in the nature of fraudulent inducement, on the part of the true owner, whereby the occupant in good faith has been misled to his detriment. Only in this last case, it seems, can the occupant in good faith maintain a bill in equity against the true and lawful owner for the value of his improvements.

In apparent, although perhaps not real, inconsistency with the rule as stated by him in his Commentaries on Equity Jurisprudence, Mr. Justice Story, in the case of *Bright* v. *Boyd*, 1 Story's Rep. 478, and again in the same case in 2 Story's Rep. 605, seems to have held that an occupant or possessor of land in good faith, who has made improvements thereon, and who has been evicted in a suit in ejectment by the true owner, may maintain a suit in equity against such true owner for allowance for the value of his improvements, without reference to any question of fraud or fraudulent inducement or other misconduct on the part of the true owner. The Commentaries on Equity Jurisprudence were first published in 1835; and the case of *Bright* v. *Boyd* was decided in 1841. And it may well be that in the interval between the two, Mr. Justice Story may have felt himself authorized by the growth of equity jurisprudence to take advanced ground in regard to the question under consideration. In the case of *Bright* v. *Boyd* he said:

"The question as to the right of a purchaser *bona fide* and for a valuable consideration to compensation for permanent improvements made upon an estate, which have greatly enhanced its value, under a title which turns out defective, he having no notice of the defect, is one upon which, looking to the authorities, I should be inclined to pause. Upon the general principles of courts of equity, acting *aequo et bono,* I own that there does not seem to me any just ground to doubt that compensation under such circumstances ought to be allowed to the full extent of the enhanced value, upon the maxim of the common law, *Nemo debet locupletari ex alte-*

*rius incommodo;* or, as it is still more exactly expressed in the Digest, '*Jure naturæ aequum est neminem cum alterius detrimento et injuria fieri locupletiarem.*'

"I am aware that the doctrine has not yet been carried to such an extent in our courts of equity. In cases where the true owner of an estate, after the recovery thereof at law from a *bona fide* possessor for a valuable consideration without notice, seeks an account in equity as plaintiff against such possessor for the rents and profits, it is the constant habit of courts of equity to allow such possessor, as defendant, to deduct therefrom the full amount of all the meliorations and improvements which he has beneficially made upon the estate; and thus to recoup them from the rents and profits. So, if the true owner of an estate holds only an equitable title thereto, and seeks the aid of a court of equity to enforce that title, the court will administer that aid only upon the terms of making compensation to such *bona fide* possessor for the amount of his meliorations and improvements of the estate beneficial to the true owner. In each of these cases the court acts upon an old and established maxim in its jurisprudence, that he who seeks equity must do equity. But it has been supposed that courts of equity do not and ought not to go further and to grant active relief in favor of such a *bona fide* possessor making permanent melioration and improvements by sustaining a bill brought by him therefor against a true owner, after he has recovered the premises at law. I find that Mr. Chancellor Walworth, in *Putnam* v. *Ritchie*, 6 Paige, 390, 403, 404, 405, entertained this opinion, admitting at the same time that he could find no case in England or America where the point had been expressed or decided either way. Now, if there be no authority against the doctrine, I confess that I should be most reluctant to be the first judge to lead to such a decision. It appears to me, speaking with all deference to other opinions, that the denial of all compensation to such a *bona fide* purchaser in such a case, where he has manifestly added to

the permanent value of an estate by his meliorations and improvements without the slightest suspicion of any infirmity in his own title, is contrary to the first principles of equity. Take the case of a vacant lot in a city, where a *bona fide* purchaser builds a house thereon, enhancing the value of the estate to ten times the original value of the land, under a title apparently perfect and complete; is it reasonable or just, that in such a case the true owner should recover and possess the whole, without any compensation whatever to the *bona fide* purchaser? To me it seems manifestly unjust and inequitable thus to appropriate to one man the property and money of another, who is in no default. The argument, I am aware, is, that the moment the house is built it belongs to the owner of the land by mere operation of law; and that he may certainly possess and enjoy his own. But this is merely stating the technical rule of law, by which the true owner seeks to hold what, in a just sense, he never had the slightest title to, that is, the house. It is not answering the objection, but merely and dryly stating that the law so holds. But then, admitting this to be so, does it not furnish a strong ground why equity should interpose and grant relief?

"I have ventured to suggest that the claim of the *bona fide* purchaser under such circumstances is founded in equity. I think it founded in the highest equity; and in this view of the matter I am supported by the positive dictates of the Roman law. . . ."

When the same case came up again before him in 2 Story's Rep. 605, Mr. Justice Story briefly, but emphatically, reiterated the doctrine, and declared that his intermediate reflections had only confirmed him in it.

It is somewhat remarkable that Mr. Justice Story's citation from Chancellor Walworth in not in accordance with the official report of the opinion of the latter as we now find it in 6 Paige; and still more remarkable that he should have said that he did not wish to be the first judge to de-

clare against the doctrine which he favored, when he had
before him and under consideration at that very moment
the opinion of Chancellor Walworth, in which that great
jurist declared against the doctrine. There are some other
remarkable facts also in reference to this matter which it is
proper· to notice. One of them is that, in various subse-
quent adjudications, notably in the case of *Williams* v. *Gibbs*,
20 How. 535, the cases of *Putnam* v. *Ritchie* and *Bright* v.
*Boyd,* although radically antagonistic to each other, are cited
together as though they established the same doctrine. An-
other remarkable fact is that, in all the cases which have
adopted and followed the doctrine of. Mr. Justice Story in
the case of *Bright* v. *Boyd,* the principal of which are *Thomas*
v. *Thomas,* 16 B. Monroe, 421; *Vallee* v. *Fleming,* 16 Mo. 152;
*Hatcher* v. *Briggs,* 6 Oregon, 131; *McKelway* v. *Armour,* 10
N. J. Eq. 115, and *Union Hall Association* v. *Morrison,* 39 Md.
281, and including the case of *Bright* v. *Boyd* itself, the de-
cisions in each and all of them may be supported upon
other grounds than that of the doctrine in question, and the
decisions in all of them are undoubtedly right, whatever
view we may take of this doctrine. It must be conceded,
however, that in each and all of them the opinion of Mr.
Justice Story in the case of *Bright* v. *Boyd* is accepted and
emphatically endorsed; and that in several of them ex-
pressly, and in all of them by necessary implication, the
doctrine of *Putnam* v. *Ritchie* is repudiated.

We presume that there can be no reasonable doubt that
the rule of the civil law as adopted and applied by Mr.
Justice Story in the case of *Bright* v. *Boyd,* is greatly more
consonant with natural justice than that of the common
law. Indeed, the latter may be placed upon the same plane
of iniquity as many other features of the common law which,
in accordance with the principles of reason, common sense,
and common honesty, we have found it necessary to change,
such as the law of primogeniture, the rule which refuses
dower in equitable·estates, the rule in Shelley's Case in many

instances, and various others that might be enumerated.
But the question is not whether the rule of the civil law is
not better than that of the common law—for in regard to
that we may say that there is no question; but whether the
courts of equity are justified in nullifying a recognized rule
of the common law.   For the rule of the common law is
recognized to be in existence, vicious and unjust though it
be.   Mr. Justice Story himself explicitly recognized it in
the case of *Bright* v. *Boyd.*   And then the question is pre-
sented whether because equity does not like this rule, and
because the rule is unjust and iniquitous, equity may pre-
vent its application in any and all cases.   For it amounts
to a judicial repeal of the rule and the virtual nullification
of it in all cases, if a court of equity can in all cases dis-
regard it; for this is the necessary result of the doctrine
announced in the case of *Bright* v. *Boyd.*   Now, we do not
understand that there can be a rule of the common law in
existence when equity can at all times nullify any such rule
upon the mere application of the party injured by it.   This
would  present the anomalous spectacle of two inconsistent,
not supplementary, systems of jurisprudence administered
by two courts of equal jurisdiction within the same sover-
eignty.   It seems to us that it is for the legislative power,
not for the judiciary, to apply the remedy in this case; and
the legislatures of most, if not of all the States of the Union
have now applied the remedy in their so-called betterment
laws.   The fact that this remedy has been applied by the
legislative authority, and was required, would seem to us to
indicate that the courts of equity did not have the power
claimed for them by Mr. Justice Story in the case of *Bright*
v. *Boyd.*   We are yet without any such statutory enactments
in the District of Columbia.

The maxim that equity follows the law was disregarded
by Mr. Justice Story in the case of *Bright* v. *Boyd*; it was
acted upon by Mr. Chancellor Walworth in the case of *Put-
nam* v. *Ritchie*; and that maxim has never been relaxed, so

far as we are aware, in the equity jurisprudence of the District of Columbia.

But even though we were disposed, upon the strength of the great name of Mr. Justice Story, to adopt his doctrine in the case of *Bright* v. *Boyd*, and to follow likewise the precedent set us by the Court of Appeals of Maryland in the case of *Union Hall Association* v. *Morrison*, especially in view of the manifest equity and justice of that doctrine, yet we feel that we are constrained by the decisions of the Supreme Court of the United States to adopt the contrary doctrine of Chancellor Walworth in the case of *Putnam* v. *Ritchie.* We understand the rule laid down by Chancellor Walworth, and not that stated by Mr. Justice Story, to have been accepted and approved by the Supreme Court of the United States. In the case already cited of *Williams* v. *Gibbs*, 20 How. 535, that high tribunal, speaking by Mr. Justice Nelson, said:

" Courts of equity, it would seem, do not grant active relief in favor of a *bona fide* purchaser, making permanent meliorations or improvements, by sustaining a bill brought by him against the true owner, after he has succeeded in recovering the property at law."

The court was evidently not unaware of the antagonism between the case of *Putnam* v. *Ritchie* and that of *Bright* v. *Boyd*, although both are cited, together with the case of *Green* v. *Biddle*, 8 Wheat. 1, in support of the rule so announced; and the announcement itself is a sufficiently clear and distinct expression of judgment, which it would be improper for us to disregard.

We understand it to be admitted by counsel for the appellee that this enunciation of the Supreme Court would be decisive of the question, for this District at least, were it not that the statement, as they claim, is *obiter dictum*, not necessary for the decision of the case before the court, and that the insertion of the words, "*it would seem*," preclude it from being regarded as an authoritative exposition of the law. We do not understand that the statement is subject

14 Ct. App.—7

to any such limitation or qualification. It was evidently made industriously and upon full consideration of the subject. The court was citing various principles applicable to the case then before them; and this principle, among others, was cited as established law. It was cited as an existing rule applicable to the case under consideration. We can not regard such a statement as having been *obiter dictum.* The qualifying words, *"it would seem,"* evidently had reference to the difference in the rules followed by Walworth and Story. Until this utterance is withdrawn or modified by the same high tribunal we think that we are bound by it.

In the comparatively recent case of *Searl* v. *School District,* 133 U. S. 553, already cited, there was ample opportunity for the Supreme Court to revise the statement of the law in this regard made in the case of *Williams* v. *Gibbs,* and to adopt the doctrine of Mr. Justice Story in the case of *Bright* v. *Boyd.* The adoption of this doctrine would have been sufficient to dispose of the case. But there was no reference to that doctrine, and no mention of the case of *Bright* v. *Boyd.* On the contrary, special mention was made of the rule as stated by Mr. Justice Story in his Equity Jurisprudence, Sec. 1237, already cited, that "courts of equity, in accordance with the principles of the civil law, when their aid is sought by the true owner, compel him to make allowance for permanent improvements made *bona fide* by a party lawfully in possession under a defective title."

The case of *Searl* v. *School District* was one in which the School District had purchased for the purpose of erecting a public school house, in entire good faith, a title which proved to be defective. The owner of the better title instituted suit in ejectment for the recovery of the land. The municipal authorities of the School District, having become satisfied that he must prevail, filed a bill in equity to enjoin him from proceeding to judgment; and thereupon, also, commenced proceedings under a statute of the State (of Colorado) for condemnation of the tract for public use. The

plaintiff in the ejectment suit appeared in the condemnation proceedings, and claimed to recover from the municipality the value of the improvements, which had been put on by the municipality itself to the amount of about $40,000, as well as the value of the land when it was acquired by the municipality, which was agreed to be the sum of $3,000. Upon these facts it was held by the court that " in exercising the right of eminent domain for the acquisition of private property for public use, the compensation to be awarded must not only be just to the owner, but also just to the public which is to pay for it; and that in such a case no vested right is impaired by giving to the municipal occupant of the land, claiming title and believing itself to be the owner, the value of the improvements made by it under that belief, when ousted by the owner of the paramount title."

Here, if ever, there was opportunity for the application of the doctrine of *Bright* v. *Boyd*; but, as we have said, there was no reference whatever made to that case or to its doctrine; and the decision was based exclusively upon the principles of equity and justice that should govern in the exercise of the right of eminent domain. Reference is made by the court to the rule of the civil law and its superior equity, and to the betterment laws of the States that have been based upon it. But the very silence of the opinion with regard to the doctrine of *Bright* v. *Boyd,* seems to us under the circumstances a strong indication that the doctrine was not accepted or approved by the court.

It is greatly to be hoped that legislation will soon remedy the hardship and manifest injustice incidental to cases like the present; but, in view of what we have said, we must regard ourselves as powerless to apply the remedy. We are, therefore, constrained to *reverse the order appealed from, and to remand the cause to the Supreme Court of the District of Columbia, with directions to dismiss the bill of complaint—the costs of this court to be paid by the appellee. And it is so ordered.*