## ARMSTRONG, RECEIVER, *v.* ASHLEY.

APPEAL FROM THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 122.   Argued December 7, 10, 1906.—Decided January 21, 1907.

Where the title of one claiming ownership of real estate in bad faith is openly questioned and attacked in actions of ejectment, neither he nor his mortgagee are entitled to an equitable lien on the property for moneys expended thereon.

One loaning money on real estate, the title to which has been, to his knowledge, attacked in an equity suit which has been dismissed without prejudice and not on the merits, takes the risk of the title and his knowledge extends

to all property described, not only in the declaration but also in amended declarations, notwithstanding the failure of the clerk, without any fault of the party filing them, to properly index the amended declarations.

Knowledge of the president of a local board of directors and of the local attorney of a building and loan association in regard to a matter coming within the sphere of their duty and acquired while acting in regard to the same is knowledge of the association, and the fact that they have committed a fraud does not alter the legal effect of their knowledge as against third parties who have no connection with, or knowledge of, the fraud perpetrated.

While one claiming to own real property cannot stand by in silence and see another expend money in improving it, he fulfils his duty by notifying the person spending the money and claiming ownership; and, in the absence of knowledge that such person is insolvent, he is not bound to ascertain whether he is making the improvements with money realized by mortgaging the premises and notify the mortgagee also.

22 App. D. C. 368, affirmed.

THIS suit was brought in the Supreme Court of the District of Columbia by the appellant, who is the ancillary receiver for the New South Building and Loan Association of New Orleans, Louisiana, hereinafter called the company, against the owners of the real property described in the bill, to establish an equitable lien upon the property for the value of improvements placed thereon with money which the company loaned to one Bràdshaw for that purpose, Bradshaw claiming to be the owner at the time. After hearing, the bill was dismissed on its merits by the trial court, and the decree of dismissal was affirmed by the Court of Appeals of the District. The opinions of both courts are to be found in 22 App. D. C. 368. The receiver has appealed here.

The title to the property, which consisted of certain numbered lots in square number 939 in Washington, had been in dispute some time prior to 1891. During the year 1889, 1890 or 1891 one Aaron Bradshaw, acting, as alleged, as agent of one John H. Walter, who claimed to have acquired the title of George Walker, entered upon and took forcible possession of the lots in question, and proceeded to erect a small brick structure on the corner lot, whereby to continue to hold possession.

The respondents herein claim to be the owners of these lots, and in the latter part of 1891 they or their grantors commenced four actions of ejectment in the Supreme Court of the District to recover possession of separate and undivided interests in the designated "ink-lot" number one, and subsequently, by proper amendments, other lots in the same square, comprising the property involved herein, were included in the declarations in those actions. A statement of facts regarding the title to these various lots may be found in *Bradshaw* v. *Ashley*, 14 App. D. C. 485, and in this court, upon review of that decision, in 180 U. S. 59, 60, where the expression "ink-lot" is explained as referring to certain ink numbers on a map of the lots in square 939, on file in one of the public offices of the city, and which also had pencil numbers on it, which were different. In that litigation the Ashleys, the respondents herein, finally established their right to the possession of the property and obtained judgment to that effect against Bradshaw, defendant in the ejectment actions, in the Supreme Court of the District some time in 1897 and in this court in 1901. These respondents were thereupon placed in possession of the property, including these lots.

While the litigation in these ejectment actions was pending, and some years before judgment therein, Bradshaw, while defending them, became a stockholder in the company in order to obtain a loan from it, and succeeded, in October, 1893, in borrowing twenty thousand dollars from the company, secured by a deed of trust upon the property in litigation in the actions of ejectment other than "ink-lot" one above mentioned. The deed was duly recorded and the money was to be used for the construction of buildings, which were subsequently placed on these lots. The money was advanced to Bradshaw by the company in installments, the last being in April, 1894.

It was obtained from the company by means, as alleged, of a fraudulent combination between Bradshaw and one Walter, the president of the local board of directors of the

company at Washington, (who claimed to have been the owner at one time of the property, but whose title, whatever it was, had been acquired by Bradshaw), together with the local attorney of the company in this District. The local attorney, in carrying out the alleged fraud, sent a defective so-called "chain of title," which, nevertheless, had been accepted by the local board of the company in Washington. It omitted certain tax and other deeds under which the respondents claimed title in themselves. This defective paper was continued by other examiners of the title, but was not revised by them. The certificate regarding the title was sent, with the defective chain of title, to the company in New Orleans by the local attorney about May 26, 1893. The certificate approved the application for the loan, but such loan was not acted upon favorably at that time. Subsequently, in October, 1893, the loan was made, the company, as is stated, relying upon the certificate of the local attorney for the period which it covered, and the certificate of the other examiner for the time thereafter passing until the making of the loan. The company has insisted that it acted at all times in good faith and made its advances upon the security of the trust deed, which it supposed was perfectly good. The trial court found that before the money was paid to Bradshaw, upon the security of this trust deed, the company was aware, through its general attorney in New Orleans, of the fact that a suit in equity had (theretofore in 1890, and before the ejectment actions) been brought by the Ashleys against Bradshaw, Walter and others, in which the plaintiffs therein claimed ownership of these lots, and wherein they asked for an injunction to restrain the defendants from setting up any title to them. The bill on file in the equity suit showed a common source of title to all the lots mentioned therein, which included the lots here in question. The attorney also knew that, although the suit had been dismissed, yet it was only for want of prosecution, and was "without prejudice." The New Orleans attorney wrote to the Washington attorney, who

then had charge of the matter, calling his attention to these facts. No notice seems to have been taken of the letter, but the certificate of. title by the examiner was given after its receipt. The company insists that during all the time it made advances to Bradshaw under the deed of trust it was ignorant of the existence of these ejectment actions, and at any rate did not know that they covered other than the corner lot, as described in the declarations before they were amended, and the amendments they were ignorant of, because, as is alleged, the clerk of the court in which the actions were pending had not properly kept the books so as to show the amendments and their nature, although they had been filed. The corner lot was not one of the lots upon which the buildings were erected.

The trial court, in the opinion delivered, said that the complainant charged the defendants with knowledge of the advances made by the company to Bradshaw, towards the erection of the buildings; but to this allegation the defendants interposed, in their answer (which was under oath), a positive denial. They admitted that, although wholly ignorant of the source from which the money came to construct the houses, yet soon after learning that one Childs, a contractor, was engaged in their construction they notified him in writing, January 4, 1894, that he had been represented to them as contractor and builder of the houses for which the ground had been broken, and which houses were then in course of erection, and he was thereby notified that if he, his agents or employés, entered upon the grounds they would be held liable for trespassing thereon, as they (defendants herein) were the owners of the lots and had not given him, or anyone else, the right or permission to enter thereon for the erection of houses or any purpose whatever, and that, as the improvements were not made with their authority, they would not be responsible for any liability contracted by Mr. Bradshaw.

The defendants, in their answer, also allege that it was not until in or about February, 1895, that defendants, or any of

them, learned of the advances made by the company or of the existence of the deed of trust. The trial court, in its opinion, stated that although "there was no evidence contradicting either of these denials, nor of actual knowledge possessed by the defendants of the matters thus denied, still it seems to me there is evidence in the record that facts might readily have been ascertained by them from which they might well have learned at an earlier time of the building and of the source from which the money employed was derived." While not finding that the defendants had actual knowledge of the advances made by the company, the court did impute knowledge of certain conveyances made to Bradshaw, and of the existence of the deed of trust to the company at earlier dates than those assigned in the answer, February, 1895. And in relation to an offer of compromise the joint answer alleged that after that time, viz., about May 31, 1895, during negotiations for the compromise of the differences between the parties, Mr. H. F. Beardsley, one of the defendants, wrote to the attorneys representing the company in behalf of himself and his associates, offering to sell to the company the lots upon which the houses then were "at their present market value or price, said value not to exceed the price at which similar lots (unimproved) in the same or contiguous squares are offered for sale. Upon the payment of said price, or sum, we will convey our title to them by deed or quitclaim, or make a binding agreement to so convey upon the determination of the pending suits, or a deed in *escrow*, as counsel shall advise. We will hold this offer open until the 1st of July next." This offer was not accepted, but there is nothing stating what, if any, objections were made to it.

Bradshaw had, in 1894, defaulted in his payments of amounts due for his stock in the company, which he had taken in order to procure his loan. Thereafter some arrangements were attempted between him and the company in regard to making his payments, but they fell through, and nothing could be done in the way of collecting anything on the mortgage or

deed of trust for the reason that the ejectment actions resulted unfavorably. The company, in 1899, became embarrassed and went into the hands of a receiver in New Orleans, and the same person was appointed ancillary receiver in this District, and brought this suit with leave of the court.

The Court of Appeals held that Bradshaw was an occupant of the premises in bad faith, with the fullest possible knowledge of the rights and claims of the appellees, and that it could not be supposed that the grantee of an occupant in bad faith could have any better right than his grantor had.

Some other facts are stated in the course of the opinion.

*Mr. Blair Lee* and *Mr. George H. Lamar,* for appellant:

The appellees, by standing by and acquiescing therein while the buildings were being erected on the property claimed by them, with the funds of the association, advanced in good faith, are estopped to deny the right of the appellant to a lien on the property to the extent of the value of the improvements. 2 Beach's Eq. 1107; *Sumner* v. *Seaton,* 47 N. J. Eq. 103; *Morgan* v. *Railroad Co.,* 96 U. S. 720; *Bryndon* v. *Campbell,* 40 Maryland, 331; *McIntire* v. *Pryor,* 10 App. D. C. 440.

The appellant, as receiver of the New. South Building and Loan Association, occupies the position of a *bona fide* purchaser for value and without notice and cannot be deprived of protection in equity by the bad faith of Bradshaw, the grantor, or the fraud of the members of the local board who participated with him in fraud on the association. *Woodward* v. *Blanchard,* 16 Illinois, 432; *Searl* v. *School Dist.,* No. 2, 133 U. S. 553; *Wright* v. *Mattison,* 18 How. 50. As to notice through agent, the agent's fraud relieves his principal. Mechem on Agency, art. 723; 2 Sugden on Vendors, *p. 1043, § 20; 2 Pomeroy's Eq. Juris., art. 675. The equity suit was not notice to the company; to affect a purchaser with notice requires a close and continuous prosecution of the *lis pendens,* and this is required by Lord Bacon's rule. 2 Sugden on Vendors, p. 1046, art. 24; 1 Johns. Ch. 576.

Without reference to the connivance and estoppel of the appellees, the appellant, as receiver of the New South Building and Loan Association, as an improver in good faith, is entitled in equity to a lien on the property to the extent of the value of the improvements bestowed with the funds of the association. *Searl* v. *School District*, 133 U. S. 553; *Bright* v. *Boyd*, 1 Story C. C. 478, 492.

The opinion of the Court of Appeals in *Anderson* v. *Reed*, concedes that the doctrine of Mr. Justice Story in *Bright* v. *Boyd* has been adopted and followed by other equity courts, citing cases of *Thomas* v. *Thomas*, 16 B. Mon. 421; *Vallee* v. *Fleming*, 16 Missouri, 152; *Hatcher* v. *Briggs*, 6 Oregon, 131; *McKelway* v. *Armour*, 10 N. J. Eq. 115, and *Union Hall Association* v. *Morrison*, 39 Maryland, in all of which the opinion of Mr. Justice Story in the case of *Bright* v. *Boyd*, is accepted and emphatically endorsed.

*Mr. J. J. Darlington* for appellees.

Mr. JUSTICE PECKHAM, after making the foregoing statement, delivered the opinion of the court.

The foregoing facts show that Bradshaw, if he were plaintiff, would have no cause of action against the defendants, based upon any allegation that he was permitted by them to build on what he thought was his own land, while the defendants stood by and did not interfere to prevent it, although knowing that the land was not his and claiming title themselves. At all times Bradshaw had knowledge that not only was his title denied, but that these defendants were asserting to the best of their ability in actions of ejectment against him, the right to the possession of, and title to, the property in question. Under such circumstances it would simply be at his own risk that he expended money on what might turn out to be other people's property, and which he knew was so claimed. His attitude in the matter would seem to have been that if he

could successfully defend the ejectment actions he could then pay the loan he had obtained from the company, while if he should prove unsuccessful in the defense it would be the company's misfortune.

The company now insists that the money was obtained from it through the fraud of Bradshaw and the others, as stated. But before coming to the question of what duty the defendants owed to the company it may be well to examine for a moment the position of the company in the transaction leading up to its loan to Bradshaw. It is true, the company asserts, that it has acted in good faith throughout the whole matter. Upon examining its position one fact is apparent and uncontradicted: Before the execution of the deed of trust, and, of course, before the advance of any of the moneys by the company to Bradshaw, the company was aware, through its general attorney in New Orleans, that a suit in equity had been commenced about March 1, 1890, by the Ashleys against Bradshaw and others, wherein they alleged their claim of ownership of the property, which included the lots in question in this case, and in which the plaintiffs sought to enjoin the defendants from setting up any title thereto. It appeared that there was a common source of title to all the lots mentioned in the bill. The bill charged fraudulent and illegal acts on the part of Bradshaw, Walter and other confederates, in undertaking to seize possession of the lots there claimed to belong to the plaintiffs therein (the defendants in this suit), and specifically described the status of the parties then existing, and denied to Walter and Bradshaw any ownership or right to the possession of the lots. The facts regarding this equity suit were presented by the general attorney for the company, in New Orleans, to the local attorney of the company in this District, and the fact that the bill had been dismissed only for want of prosecution and without prejudice was specially called to the attention of the local attorney. No action seems to have been taken regarding the contents of that letter by the local attorney after its receipt other than

to certify to the title, nor does the general attorney seem to have inquired further about the facts. The bill was, of course, on file in the clerk's office, and it showed the contention as to the title between these defendants and Bradshaw and his associates. With this knowledge, therefore, it is impossible to say that the company was ignorant of the fact of the existence of a question as to the title of Bradshaw to the premises on which he was seeking to obtain this loan. The dismissal of the bill without prejudice, for want of prosecution, would not be evidence that the title of Bradshaw was good or that the controversy had been settled. It certainly was a warning of the existence of a question as to the title, and it was, at any rate, notice enough to start the company upon some investigation of the facts as to the actual condition of the controversy respecting it. And at this time the ejectment actions had been brought and were pending. The declarations in those actions were then on file in the clerk's office of the Supreme Court of the District, and showed the actions were originally brought to recover possession of "ink-lot" one. It is true that while that particular lot did not include the premises upon which the buildings were subsequently erected, yet the source of title to all the lots was the same. Some months before the deed of trust was executed amendments to these declarations, which did include those lots, had been made and were on file in the clerk's office among the papers in those actions.

Actual knowledge of the fact of the existence of the ejectment actions in regard to "ink-lot" one is, however, denied by the company, and a like denial is made in regard to the amendments to the declarations. The local attorney had knowledge of them, or ought to have had. But so long as the company had knowledge of the equity suit and the contents of the bill therein there was enough to put the company on inquiry as to the state of the title. If under such facts the company loaned the money, it showed its willingness to take the risk of the validity and sufficiency of the title of Bradshaw.

The company denied knowledge of the amended declarations because of the alleged defect in the manner of keeping the books in the clerk's office, wherein the ejectment actions were entered, but no statement was made on the page of the docket devoted to those actions of the existence of amendments to the declarations. The amendments were, however, duly filed in the clerk's office, and the alleged failure of the clerk to properly index the amendments was no answer to the failure on the part of the searcher to examine the files for the purpose of seeing the papers in existence in the actions. In this matter we agree with the opinion of the Court of Appeals, in holding that the respondents here were in nowise responsible for the alleged failure of the clerk to make additions to the docket or index book. Nor is there any evidence that the persons acting for the company were in any way misled by such failure, to the company's detriment.

The company also insists that it ought not to be charged with any knowledge of any fact which was known only by Walter and the local attorney. The company asserts, first, that Walter and the local attorney were not its agents; and, in any event, by reason of their fraud, knowledge by the company should not be imputed to it because of the knowledge of its agents. The company asserts that Walter was simply the president of its local board, composed of the stockholders in the company residing or to be found in Washington, and that his action was not the action of an agent under such circumstances. It also asserts the same thing in regard to the local attorney, and denies liability for their acts. We think the position can not be maintained. The president and attorney were directors of the local board and had to be directors before they could hold either office, and the local directors had to be approved by the board of the main office. It was to this local board that the application was first to be made for a loan, and it was to be approved by it and transmitted at once to the main office, signed by the president, secretary and attorney of the local board on a form furnished by the

association to applicants for a loan. Transactions of a local nature were put in charge of the local attorney, who represented the company at his locality, and loans were consummated by him and papers sent to him by the company for such action as was necessary for the completion of a loan. The knowledge of the attorney and of the president of the board in regard to a matter coming within the sphere of their duty, and acquired while acting in regard to the same, and sending to the company in New Orleans their report which it was their duty to make, must be imputed to the company. The fact that those agents committed a fraud can not alter the legal effect of their acts or of their knowledge with respect to the company in regard to third parties who had no connection whatever with them in relation to the perpetration of the fraud, and no knowledge that any such fraud had been perpetrated. There is no pretense of any evidence that the defendants had any connection with these alleged frauds, and no pretense that they had any knowledge of their existence, if they did exist. In such case the rule imputing knowledge to the company by reason of the knowledge of its agent remains.

But, even if it be assumed that the company had no more than a knowledge of the equity suit and its dismissal without prejudice, it simply shows that the company was willing to take the risk of the title, although confessedly questionable.

Upon these facts we can not see that the defendants can be held liable to the plaintiffs on account of any failure of duty on defendants' part. If the buildings were being erected by Bradshaw, there was certainly no duty on the part of defendants to notify him of their title to the property, and we can not see that there was any such duty resting upon the defendants to endeavor to find out through what sources Bradshaw obtained the money to erect the buildings, and to inform the person who was loaning the money that the defendants claimed the property as theirs.

Assuming even that the company made the loan in the *bona fide* belief that Bradshaw had title and that the claims

of the defendants to the ownership of the lots were not well
founded, and also that no knowledge of the agents of the com-
pany in Washington could properly be imputed to it, and we
still have the fact that the company loaned its money with
knowledge of the equity suit and of the allegations of the bill
therein regarding the title of the defendants and the lack of
any title in Bradshaw. Imputing no knowledge to the com-
pany other than it actually possessed, the same course should
be taken with the defendants. In that case we have their
sworn denial, unaffected with any proof to the contrary, that
they had any actual knowledge of the existence of the deed
of trust or of any connection of the company with Bradshaw,
or of any advances made by it to Bradshaw, until Febru-
ary, 1895 (long after all the moneys had been advanced), and
even in regard to Bradshaw himself they notified the con-
tractor early in January, 1894, that they owned the property
and they would not be responsible for any expenditures made
by Bradshaw, and that if the contractor went on he would
be regarded as a trespasser.

There is no finding that Bradshaw was insolvent, or that
the defendants had any knowledge of it if he were insolvent,
and hence there is nothing to lead to the assumption that
the defendants knew the buildings could only be erected by
Bradshaw with borrowed money, and nothing to show any
duty on the part of defendants to take active steps and make
a search to endeavor to find out who was loaning him money,
and on what security. And yet this is the contention on the
part of the complainant. We think it must be regarded as an
extraordinary contention and an unreasonable application
of the doctrine of constructive notice. This is the language
used by the Court of Appeals, and it properly describes the
situation. Certainly constructive notice can not be applied
to the owner of property in regard to the existence of a mort-
gage thereon, placed there by some one who did not own such
property. The owner of real estate is under no obligation
whatever to watch the records to see whether some one who

does not own his property has assumed to place a mortgage upon it or convey it by deed to some third person. The defendants knew Bradshaw was in possession and they saw buildings being erected on the lots. Were they to assume that Bradshaw was borrowing the money and that they must, therefore, go to work to find out from whom he was borrowing and notify him of the facts? They in fact knew nothing of the deed of trust, but, by imputing knowledge, the claim is made that a duty founded upon such imputed, but not upon any actual, knowledge, rested upon defendants, for the failure to discharge which the defendants ought to be held liable.

No case has been called to our attention which in any degree resembles the claim made by the company herein. The man who actually erected the buildings knew all about the state of the title, and that it was contested by the defendants in the most earnest and emphatic manner in their actions of ejectment to recover the lots. The evidence fails to show that the company was, before the money was advanced, entirely innocent of any knowledge on its part which would lead to doubt as to the ownership of the property by Bradshaw. But even its actual good faith, in the popular sense, can not charge the defendants with the duty of active investigation to discover from what source Bradshaw obtained the money to build. The simple facts are that the defendants were in possession of the property when this suit was commenced, and they ask no aid from a court of equity to place them in possession. They had recovered it in their actions at law, and a court of equity will not, even in the case of a *bona fide* improver, grant active relief in such a case. 2 Story Eq. Juris. (12th ed.) secs. 1237–1238; *Williams* v. *Gibbes*, 20 How. 535–538; *Anderson* v. *Reid*, 14 App. D. C. 54; *Canal Bank* v. *Hudson*, 111 U. S. 66, 79; *Searl* v. *School District, &c.*, 133 U. S. 553, 561, and other cases, cited by the trial judge in his opinion, and in the opinion of the Court of Appeals. The case of the company is not strengthened by its knowledge that the title of Bradshaw was questionable.

*Morgan* v. *Railroad Co.,* 96 U. S. 716, 720, cited, among other cases, by the appellant, has no application. The facts are so wholly different in their nature as to present a case which does not touch the principle decided herein. There was conduct on the part of the appellant which was such as to amount to fraud or misrepresentation, leading appellee to believe the existence of a fact upon the existence of which appellee acted. We find no cases in opposition to the result we have arrived at.

The decree of the court below is

*Affirmed.*