## ADLER v. NEW YORK LIFE INS. CO.

Circuit Court of Appeals, Eighth Circuit.
May 29, 1929.

No. 8016.

Thomas S. Buzbee, George B. Pugh, H. T. Harrison, and A. S. Buzbee, all of Little Rock, Ark., for appellant.

Louis H. Cooke, of New York City, and Rose, Hemingway, Cantrell & Loughborough, of Little Rock, Ark., for appellee.

Before STONE, LEWIS, and BOOTH, Circuit Judges.

STONE, Circuit Judge. This is an appeal from a decree canceling a life insurance policy on the ground of fraud and enjoining the beneficiary from bringing suit for recovery thereon.

William F. Perrin made applications to appellee for five insurance policies on his life. These applications were upon November 14, 1924. In connection with these applications he was examined by two medical examiners for the company. As a part of these examinations he signed a form, which was "Part II" of the application (entitled "Part II Application to the New York Life Insurance Company Answers to the Medical Examiner"), wherein he had written answers to various printed questions. Above his signature was a paragraph, reading, in part: "I declare that I have carefully read each and all of the above answers, that they are each written as made by me, and that each of them is full, complete and true, and agree that the Company believing them to be true shall rely and act upon them." The entire application was attached to the proper policy. Each policy contained a provision as follows: "The Policy and the application therefor, copy of which is attached hereto, constitute the entire contract. All statements made by the Insured shall, in absence of

fraud, be deemed representations and not warranties, and no such statement shall avoid the Policy or be used in defense to a claim under it, unless it be contained in the written application and a copy of the application is indorsed upon or attached to this Policy when issued."

Among the questions in the application were the following with the answers thereto given by Perrin:

where his condition was diagnosed as duodenal ulcer; that he was also treated within five years prior to said application by Dr. R. C. Dorr, of Batesville, Arkansas; that he had been suffering from stomach trouble for several years before making said application, and that his malady was so serious as to require him to take a vacation; that within said period he had had various prescriptions, which had been written out for him by

| 7. A. Have you had any accident or injury or undergone any surgical operation? | "Yes" or "No" "Yes" | DETAILS and, if within five years, name and address of every Physician consulted Tonsilectomy—in 1918 |
|---|---|---|
| B. Have you been under observation or treatment in any hospital, asylum or sanitarium? | No | |
| C. Has albumin or sugar been found in your urine? | No | |
| D. Have you been found to have a high blood pressure? | No | |
| E. Have you raised or spat blood? | No | |
| F. Have you gained or lost in weight in the last year? | No | Gain?        Loss?        Cause? |

| 8. Have you consulted a physician for or suffered from any ailment or disease of | "Yes" or "No" | Name of Ailment or Disease | No. of Attacks | Date | Duration | Severity | Results and, if within five years, name and address of every Physician consulted |
|---|---|---|---|---|---|---|---|
| A. The Brain or Nervous System? | No | | | | | | |
| B. The Heart, Blood Vessels or Lungs? | No | | | | | | |
| C. The Stomach or Intestines, Liver, Kidneys or Bladder? | No | | | | | | |
| D. The Skin, Middle Ear or Eyes? | Yes | Slight deafness | 1 | Oct. 1921 | 3 weeks | mild | Complete recovery F. G. A. Bardenheim |
| 9. Have you had Rheumatism, Gout or Syphilis? | No | | | | | | St. Louis, Mo. |
| 10. Have you consulted a physician for any ailment or disease not included in your above answers? | No | | | | | | |

| 11. What physician or physicians, if any, not named above, have you consulted or been examined or treated by within the past five years? | Name and Address None (If none, say none.) | Date | Reason for Consultation, Examination or Treatment |
|---|---|---|---|

The fraud alleged as the basis for cancellation of the policies is that some of the above-quoted answers were false and fraudulent in that:

"The said Perrin had been treated by Dr. Caulk of St. Louis, Missouri, for chronic prostatitis, at intervals from the year 1922 to the year 1925; that he was treated in 1921 by Dr. Salter of St. Louis, for stomach trouble, and that Dr. Salter referred him to Doctors Soper and Mills, also of St. Louis, by whom he was treated in December, 1921,

physicians; filled at sundry drug stores, and that as far back as September 28, 1918, he had been examined at the Mayo Clinic, at Rochester, Minnesota, which advised him that he had symptoms pointing to a duodenal ulcer.

"Ulcers of this description are extremely dangerous and most frequently fatal and the said Perrin, with full knowledge that he was suffering from this malady, made application for the said policies of insurance and with a fraudulent intent of procuring the amount

thereof for his estate, by a deceitful concealment of his true condition, and with full knowledge that if the true facts had been known to the plaintiff it would have refused to issue said policies."

Two amendments to the petition were as follows:

"In addition to the maladies set forth in the complaint the plaintiff has discovered, since the death of the said Wm. F. Perrin, that from the year 1922 to the year 1925 he was repeatedly treated by Dr. Caulk, of St. Louis, Missouri, for seminal vesiculitis, a serious malady; and the said Perrin, who was a life insurance agent, knew full well that if it were known to this plaintiff that he had been treated for duodenal ulcer, prostatitis or seminal vesiculitis his application for a policy upon his life would have been rejected by the plaintiff, and wilfully concealed in his application to the plaintiff the fact that he had suffered from these maladies and had been treated therefor by physicians. * * *

"The plaintiff has recently discovered that in addition to the physicians who attended upon the said William F. Perrin, within five years prior to the application for the policies of insurance therein, the said Perrin went through the clinic of the Battle Creek Sanitarium, at Battle Creek, Michigan, where he was found to be suffering from constipation, intestinal toxemia, neurasthenia and pyorrhea, which circumstances were fraudulently concealed by the said Perrin in making his application for insurance."

The answers to the petition and to the amendments deny the treatment for chronic prostatitis by Dr. Caulk, the treatment for stomach trouble by Dr. Salter; deny treatment by Dr. Soper or Dr. Mills; any treatment by Dr. Dorr within five years prior to the applications for insurance;. any prescriptions; any examination at the Mayo Clinic; any treatment by Dr. Caulk for seminal vesiculitis or any examination by the Battle Creek Sanitarium Clinic. It further alleges that, if he was treated by Dr. Caulk for chronic prostatitis or seminal vesiculitis or by Dr. Salter for stomach trouble, the trouble was not serious or in any manner rendered him unfit to procure insurance or that his applications would have been denied because thereof; that such treatment was not material and was not known to or remembered by Perrin at the time of his applications. Also, denies that he had or knew he had any stomach trouble prior to or at the time of his applications. Denies that any symptoms of duodenal ulcer were found by the Mayo Clinic, that he was advised thereof, or that, at the time of the applications, "he knew or remembered" he had been at the Mayo Clinic. Denies any fraud or deceit.

The issues argued here are the sufficiency of the evidence, the competency of certain evidence, the materiality of the false statements, and the imputed knowledge of the appellee as to the truth of the facts involved in the false statements.

▮ The material evidence as to times and maladies of medical treatments of Perrin was as follows:

Perrin was a life insurance agent 39 years old at the time of the applications. He seems to have been more than ordinarily successful. He retained his residence at Batesville, Ark., although he seems to have been mostly in St. Louis for some years and later in Philadelphia. His business required him to do considerable traveling.

September 28, 1916, he became a patient of the Mayo Clinic at Rochester, Minn. His chief complaint was "colicky pain in the upper abdomen." The clinical history given by Perrin and recorded at the Clinic was "for the past three weeks had had attacks of a sudden colicky sensation in the upper epigastrium, with a dull aching, to which he would not have paid attention except for its dailey occurrence. * * * His home doctor had diagnosed duodenal ulcer. * * * Patient feared perforation." The physician's résumé was "not stomach (disease)." The consultant's résumé was: "Eat normally and observe. May be ulcer." Further consultation was: "Duodenal ulcer 75%. Pylorospasm? Patient seems anxious for exploration but aside from that would seem best to wait." The recommendations were: "Early ulcer treatment alkaline tablets, 10 grains of calcined magnesia and 15 of bismuth subnitrate. Rhubarb and soda mixture." The final diagnosis was: "Early ulcer history."

Perrin was at the Battle Creek Sanitarium from March 20, 1920, until May 4, 1920, under care of Dr. Knapp (who was not a witness). He returned August 13, 1921, and remained until September 16, 1921, under care of Dr. Heald, who was called as a witness by plaintiff and "under advice of counsel I decline to give the result of my examination." The only information as to the reason for his going to Battle Creek or the diagnosis or treatment there appears in the testimony of other physicians (who examined or treated him at later periods) to whom Perrin made statements concerning such matters. In the history he gave to Dr. Mills in December, 1921, appears this: "X-ray by Carmen at Mayos and Case at Battle Creek.

830

That might be duodenum ulcer at Battle Creek and negative at Mayos."

Perrin talked with Dr. Salter, who was medical referee for the insurance company represented by Perrin. To Dr. Salter he "said something about some stomach trouble." Dr. Salter did not treat him, but referred him to Dr. Spoor, or Soper and Mills, who specialized in gastro-intestinal diseases. Just when this conversation took place is not fixed.

December 13, 1921, Perrin consulted Dr. Mills. "His symptoms were belching and colicky pains in the epigastric region, not relieved by eating or taking milk of magnesia; pain was rather constant, not severe in type but colicky, * * * patient thought that pains were induced by overwork, as he noticed he had indigestion when he got too tired." Various tests were made which showed normal, except that some of the duodenum cap plates suggested ulcer while one was perfect. "Suggestion of duodenum ulcer, secondary indications." The final diagnosis was "dyspepsianerosa with possibility of duodenum ulcer."

Two days later, Dr. Mills saw him again and prescribed "a diet list giving him a mild alkaline powder to take after each meal and advised him to take more rest." About three weeks later (January 9, 1922) Perrin reported that he had tried to adhere to the diet and was greatly improved. Dr. Mills made additions to his diet list and advised him to stop using the alkaline powder. That ended his treatment by Mills.

March 11, 1922, Perrin went, at Dr. Salter's suggestion, to Drs. Caulk and Sanford, specialists in bladder and kidney diseases. Dr. Sanford testified: "I was treating him for chronic prostatitis and seminal vesiculitis." Perrin was out in the country much of the time but came for treatment when in the city. Beginning with that date, Dr. Sanford treated him until he left to live in Philadelphia, late in 1925. Up to the date of the applications, Perrin had received 111 such treatments, of which 32 were in 1922, 8 in 1923, and 71 in 1924 (up to the date of the applications, November 14, 1924). Of these treatments in 1924, 10 were in April, 13 in May, 12 in June, 9 in July, 8 in August, 9 in September, 8 in October, and 2 (November 5 and 11) in November prior to the applications. After the applications, there were 6 treatments in November, 3 in December, and 47 in 1925 up to October 12th of that year. Dr. Sanford testified that his trouble was not serious, and, "The fact that he came to us so frequently indicated that he was nervous and

apprehensive about his trouble and exaggerated it." Perrin told Dr. Sanford that he had been treated by a doctor in San Francisco and by one in St. Louis. When Perrin left for Philadelphia, Sanford gave him a letter to Dr. Randall (a specialist in urology there) in which he stated, "We have been treating him for a very persistent chronic prostatitis and a seminal vesiculitis."

Perrin told Dr. Caulk that he had "the vaso puncture two or three years ago and had stomach trouble three years ago and was treated by Soper and Mills and cured."

During the treatment by Dr. Randall (September 2, 1925, to July 15, 1926), Perrin "told me about his stomach trouble and probably mentioned Dr. Miller and asked me what I thought of him. * * * I think he said something to me about having had a diagnosis of duodenal ulcer." On February 27, 1926 (while under Dr. Randall for treatment for the other ailments), Perrin went to Dr. Miller (specialist in internal medicine) "stating that he had a duodenal ulcer and asked my advice as to what he should do." "He told me that he had had symptoms since 1916. That he had been studied at various places and a diagnosis of duodenal ulcer had been made. I can't state whether he told me he had been treated or not; but he said he had seen Dr. Chas. Mayo of Rochester, Minnesota; also, that he had seen Dr. Soper and Dr. Mills. In order to confirm my suspicions about him, I gave him a test meal and on March 5, I found an excess of acid in his stomach, both free hydrochloric acid and total acidity. I also had him X-rayed on March 11, 1926. I reached the conclusion that he [——] a duodenal ulcer and referred him for an operation to Dr. Eliason."

The agent who took the applications testified that he knew of the visits to the Mayo Clinic in 1916 and to the Battle Creek Clinic in 1920 and 1921 and that Perrin "had consulted physicians in St. Louis," and that he "agreed with William F. Perrin that the mention of these matters was a matter of no consequence and they were left out on that account."

The above evidence shows that Perrin, at the time he made these applications, remembered that he had been at Mayos and Battle Creek for stomach trouble. He knew that his local doctor had diagnosed this trouble as duodenal ulcer; that Mayo, in 1916, had been doubtful or thought no such ulcer; that at Battle Creek, in 1920 or 1921, had diagnosed the trouble as ulcer; that Dr. Mills, in December, 1921, had diagnosed his trouble as "suggestion of duodenal ulcer" and

had dismissed him as needing no further medical attention early in January, 1922; that there was grave danger in perforation from such character of ulcer. In short, he knew that this trouble had recurred and, when existent, was dangerous, and he might well have thought he was cured thereof, when he made the applications. ·

As to the prostatitis and seminal vesiculitis, he had been under constant treatment for two years and eight months preceding the date of the applications and was in regular course of such treatments at the time of the applications and was "nervous and apprehensive about his trouble."

He was an experienced life insurance agent. He knew the purpose of these questions in the application. He knew the home office medical examiners passed upon the data in the application to determine whether the insurance was to issue, be rejected, or further medical investigation made. He knew that an important part of this data consisted of his medical history, and that such history could be obtained only from his answers or from physicians whom he might name therein. With this knowledge of the purposes of the questions and the effect of his answers on the local medical examiners and those at the home office and with this knowledge of his past trouble with his stomach and his present urinary tract troubles and treatment, he answered, "No," to the questions following: "Have you consulted a physician for or suffered from any ailment or disease of the Stomach, or Intestines, Liver, Kidneys or Bladder?" And he answered, "None," to the question: "What physician or physicians, if any, not named above, have you consulted or been examined or treated by within the past five years?"

Yet, he answered the question, "Have you consulted a physician for or suffered from any ailment or disease of the Skin, Middle Ear or Eyes?" as follows: "No except slight deafness, one attack, Oct. 1921, duration three weeks, mild, complete recovery. F. G. A. Bardenheim, St. Louis, Mo." The last is the name of the attending phyician.

In short, Perrin (an experienced life insurance agent) thought it material to mention a single "mild" attack of "slight deafness" occurring in October, 1921. On the other hand, he not only entirely failed to mention the stomach trouble which had recurred in August and September, 1921 (just before the deafness), and resulted in a trip to Battle Creek and treatment at St. Louis in December, 1921 (shortly after the deafness), but, knowingly and deliberately, answered, "No," to the question concerning stomach diseases. It will not do to say that he thought this stomach trouble cured because the early trouble had resulted in "complete recovery." Obviously, the stomach trouble was more serious than the ear. It had recurred. It had been twice diagnosed (local physician and Battle Creek Clinic) as a duodenal ulcer. The danger of such ulcers (according to this testimony) is perforation, and then an operation must be had within 24 hours to save life. The evidence is that Perrin knew of these diagnoses and of the danger if perforation should occur. Again, he knew he was, and for some time had been, under treatment for chronic prostatitis and seminal vesiculitis at the time of the applications.

If it was material to state he had had a slight attack of deafness, four years earlier, from which he had entirely recovered, he knew it was more important to state the facts concerning the past stomach trouble and the then existing urinary tract disease. The fraudulent purpose is clear. The trial court is certainly amply sustained in its view that these omissions from the applications were fraudulent.

■ The above view is based upon the evidence which was admitted. The second contention is that certain material parts of this evidence were inadmissible. The challenged evidence is the record of Perrin's case at the Mayo Clinic (introduced in connection with the testimony of Dr. Hartman) and the office record of Perrin's case made by Dr. Mills (introduced in connection with the testimony of Dr. Soper). The objection to these records is lack of proper foundation.

The Mayo record was identified by Dr. Hartman, who treated Perrin, as "made at the time under my direction, and verified by me."

The Mills record is identified as follows: Dr. Soper testified that he and Dr. Mills had been partners until the death of Dr. Mills in 1924; he had never met Perrin; it was "the practice of our firm to keep a record of our cases"; none of this record was in Dr. Mills' handwriting but was typewritten; "It was his habit to dictate all of his stuff to a stenographer; seeing the patient, then when it was fresh in his mind, he stepped into the next room, dictated to the stenographer, and walked on out. I know that was his method and those were his notes." Dr. Mills' stenographer at that time was Miss Adele Aegerter. Miss Aegerter testified to her employment by Drs. Soper and Mills at the time covered by the record. Further that: "It was the uniform custom of Dr. Mills to dic-

tate to a stenographer the notes upon this diagnosis of patients applying to him for treatment and it was my custom to take down the memoranda. I remember taking down his notes as to the diagnosis of Mr. Wm. F. Perrin December, 1921, and January, 1922. I attach a photograph of the clinical history of Mr. Perrin. (The photograph is identical with the record given by Dr. Soper in his deposition)."

It is a well-known fact that many physicians take notes and make an office record of examinations and treatments of their patients. The purposes and the usefulness of such records in their practice is obvious. There is as much reason for verity in such records as in books of account. In fact, there is more reason for verity, because dishonesty might prompt false entries in books of account, while there is no reason why a physician making a record to aid him in treating a patient should consciously make a misstatement therein. We see no reason why such records, when properly identified, should not be admissible as to all matters proper for inclusion in such character of record.

The Mayo record is identified by the physician who made the examination as being "made at the time under my direction and verified by me." No record could be more surely identified.

As to the Mills record, the testimony is that it was his custom to make such records by dictation to his stenographer; that this was the record dictated to and transcribed by the stenographer; that it was in connection with the examination and treatment of Perrin; that it comes from the proper custody. This identification is by the business partner of Mills and by the stenographer. Mills being dead, this identification was complete.

These identifications fully measure up to the requirements stated by this court that the records "probably represent truly the facts which they purport to show" and are "the best and most available evidence." St. Paul F. & M. Ins. Co. v. American Food Products Co. (C. C. A.) 21 F.(2d) 733, 737.

Therefore, this evidence was properly admitted, and all of the evidence abundantly established actual fraud in the answers and concealments.

Appellant argues that "appellee failed to show the materiality of the untruthful answers." It may be that failure to remember diseases or treatments or omissions of such as are honestly thought to be trivial or not within the meaning of the questions in an application may disprove the presence of fraud. Mutual Life Ins. Co. v. Hurni Packing Co., 260 F. 641, 644, this court. However, there is no room here for any such thought. Taking into account Perrin's experience and knowledge, there is no rational explanation of his conduct except that he intended deliberately to conceal and mislead. Also, the evidence leaves no doubt of the materiality of the matters concealed. In addition, it is difficult to imagine an honest frame of mind in an applicant who thinks it would be immaterial for an insurer to know that he had been under practically continuous treatment for more than two years immediately preceding and at the time of the application. Mutual Life Ins. Co. v. Hurni Packing Co. [C. C. A.] 260 F. 641, 645, last paragraph.

Appellant argues that, because the agent who took the applications knew of the matters which were omitted and approved the answers, such knowledge was the knowledge of the company. We need not enter into an extended discussion of when such knowledge by the agent is knowledge of the principal. Clearly, such is not true when the agent knows that an actual fraud is being perpetrated on his principal and participates therein. Mutual Life Ins. Co. v. Hilton-Green, 241 U. S. 613, 622, 623, 36 S. Ct. 676, 60 L. Ed. 1202; Armstrong v. Ashley, 204 U. S. 272, 283, 27 S. Ct. 270, 51 L. Ed. 482; American Surety Co. v. Pauly, 170 U. S. 133, 156, 18 S. Ct. 552, 42 L. Ed. 977; Schutz v. Jordan, 141 U. S. 213, 220, 11 S. Ct. 906, 35 L. Ed. 705; Interstate National Bank v. Yates Center National Bank, 245 F. 294, 296, 297, this court; Bank of Overton v. Thompson, 118 F. 798, 800, this court; Thomson-Houston Elec. Co. v. Capitol Elec. Co., 65 F. 341, 343, opinion by Judge Taft in Sixth Circuit; Western Mortg. & Inv. Co. v. Ganzer, 63 F. 647, 650, Fifth Circuit).

The decree is affirmed.