## JONES v. UNITED STATES.
### No. 11534.

Circuit Court of Appeals, Eighth Circuit.
June 5, 1940.

J. A. Tellier, of Little Rock, Ark., for appellant.

Thomas E. Walsh, Atty., Department of Justice, of Washington, D. C. (Sam Rorex, U. S. Atty., and George W. Hendricks, Atty., Department of Justice, both of Little Rock, Ark., Julius C. Martin, Director, Bureau of War Risk Litigation, Wilbur C. Pickett, Sp. Asst. to the Atty. Gen., and Fendall Marbury, Sp. Attorney, Department of Justice, all of Washington, D. C., on the brief), for appellee.

Before GARDNER and WOODROUGH, Circuit Judges, and MOORE, District Judge.

MOORE, District Judge.

Plaintiff brought suit against the United States to recover on four twenty-year payment war risk insurance policies issued on the life of her husband, Grady Furth Jones, a soldier in the World War. Plaintiff, beneficiary in the policies, sued in her capacity as executrix and as beneficiary, for the reason that part of the benefits under the policies accrued during the life of the insured.

The answer of the defendant charged fraud in obtaining the reinstatement of the policies in that the application contained false statements and material misrepresentations upon which the Government relied in reinstating the insurance.

The case was tried on the sole issue of fraud in the reinstatement of the insurance and, at the close of the evidence, both the plaintiff and the defendant filed separate motions for directed verdicts in their respective behalfs. The trial court overruled the motion of the plaintiff and sustained the motion of the defendant. Judgment having been entered upon the directed verdict, plaintiff appeals.

The evidence for the plaintiff disclosed that the insured was a soldier in the World War and was honorably discharged; that while in service he contracted for war risk term insurance and was issued a certificate thereof in the sum of $10,000; that he permitted his term insurance policy to lapse shortly after his discharge in 1919; that on April 1, 1926, upon the reinstatement and conversion of term policy the Government

issued to the insured four twenty-year payment life insurance policies, each in the sum of $2,500, which policies insured deceased against total and permanent disability and death. All premiums were paid in cash on the four policies until after the insured became permanently and totally disabled. The insured was rated as being totally and permanently disabled by the Veterans Administration as of September 4, 1929, which condition continued until his death on February 17, 1935; that as of May 11, 1932, the insured was both totally and permanently disabled from active pulmonary tuberculosis.

In his application for reinstatement of the insurance, made on March 22, 1926, the insured answered questions 6, 10 and 11 as follows:

Question No. 6: "Are you at present suffering from any disability which is the result of an injury or disease, or of an aggravation thereof, suffered or contracted in the active military or naval service during the World War? (If so, give full details, as to the nature of such disability, disease or injury, where and when contracted, and what treatment, if any, is being received at this time.)" Answer: "No."

Question No. 10: "Have you contracted any disease or suffered any injury since lapse of this insurance? If so, state full particulars, date, name and address of physician, if one attended you." Answer: "No."

Question No. 11: "Have you consulted a physician in regard to your health since lapse of this insurance? If so, state full particulars, date, name and address of physician." Answer: "Yes. Examination for life insurance with New York Life, Dr. V. McCammon was examiner, Arkansas City, Arkansas."

On August 1, 1929, the insured made application under oath for disability compensation in which he stated that he had been suffering from tuberculosis since December, 1918, and was treated at an infirmary in England; by doctors on the ship returning to the United States and since his discharge from the service by Dr. J. W. Francis, from March, 1922, to February, 1927. In an affidavit made by the insured in support of his application and in testimony given by him in November, 1933, before a special board in connection with his claim for restoration

of his compensation which had been cut off by the Economy Act, he stated that shortly after starting to work as timekeeper and pay-master for a lumber company on January 1, 1919, he "began feeling badly" and suffered from loss of weight, loss of appetite, on account of which he consulted and was treated by Dr. Francis, the physician for the company for which the insured worked; that the physician first prescribed medicine for him, but later, after "a thorough examination", advised him to leave the climate at once; that the doctor had given him this advice in 1920 or 1921 and had expressed the view that he, Jones, had "something the matter with his lungs". The affidavit of the insured fixed the summer of 1924 as the time when the doctor advised him to leave the climate and in that affidavit stated that the doctor advised him at that time that he had tuberculosis. This condition continued during 1925 and 1926 and he "continued to consult the doctor when he was feeling badly."

Dr. J. W. Francis, a witness for the Government, testified that the insured came to his office in the Spring of 1922 for examination and treatment, complaining of loss of weight, energy and appetite and of restless nights; that he found a rising temperature each afternoon and detected moist rales in the left lung by means of a stethoscope; that he recommended a long vacation and prescribed rest and diet; that the insured returned to his office in the Fall of that year, when he found his condition practically the same as he had in the previous Spring, and continued treatment of the insured until the Spring of 1924, at which time the rales were more noticeable and the temperature increased. He then diagnosed the condition as active pulmonary tuberculosis, recommending a change of climate, rest and diet; that the insured continued to report to him from time to time until the summer of 1926, and that during that time the complexion of the insured had changed noticeably, his complaints were the same, his loss of weight was noticeable and he had a troublesome cough.

This witness testified that malaria was common in the country where the insured lived and that trouble had to be eliminated first in making the diagnosis; that the insured's symptoms were all consistent

with the diagnosis of malaria except the moist rales, adding that "you do not have the lung complication with malaria; you do not have the moist rales, the breathing, you have with tuberculosis."

On cross-examination Dr. Francis identified his signature on a report of an examination made by him of the insured on December 30, 1925, in connection with an application for insurance with the New York Life Insurance Company dated January 1, 1926, in which this question appears, with the answer given by the witness:

Question: "Do you find any evidence of past or present disease of the lungs?" Answer: "No."

Four witnesses for the defendant identified affidavits executed by them in July and August of 1929 in support of the insured's claim for compensation. These affidavits contained statements to the effect that the insured had seemed to be in a run-down condition since 1924.

Dr. V. McCammon testified for the plaintiff, stating that he examined the insured in connection with the reinstatement of the assured's term policy and that in his examination he did not find any abnormality of the lungs of the deceased, and so stated in his report of the examination. He testified that he had known the insured for several years, had seen him frequently, several times a day and that in view of his familiarity with the physical condition of the insured, he did not believe the insured had tuberculosis at the time of the examination and did not develop it until some years later. He further testified that on August 31, 1929, he signed insured's application with the Equitable Life Insurance Company for disability benefits based on tuberculosis; that he never knew of the insured being sick until sometime in 1928 or 1929; that he saw no difference in his physical condition between 1919 and 1926 and that in filling out the application he did not ask the insured whether he had tuberculosis, relying upon his own knowledge.

Dr. A. C. Shipp, a witness for the plaintiff, testified that he was sixty years of age and had graduated from the University of Indiana School of Medicine in 1912; that he had an A. B. and an A. M. and in Pathology a Master's Degree and had done research work in a tuberculosis sanitarium in Asheville, North Carolina; had two years research work in the Department of Tuberculosis of the University of Indiana and Department of Pathology and for three years was a member of the faculty of the University of Arkansas teaching Pathology and Bacteriology in the Department of Medicine, and from 1917 on in the practice of medicine, diseases of the chest and diagnosis, and that he specialized in the treatment of tuberculosis to a marked degree.

Dr. Shipp further testified that he first saw the insured on April 23, 1932, to begin his examination which he completed on May 11, 1932, and made a report to the United States Veterans Bureau. He found active pulmonary tuberculosis, far advanced with cavitation in both lungs and subcervicular sounds, immediately under the collar bone on both sides. He testified that he had examined the testimony of Dr. Francis, which was part of the Government's evidence; that he had examined the method which Dr. Francis used to arrive at his conclusion that Grady Jones had tuberculosis prior to March 22, 1926, and that with the methods used as detailed by Dr. Francis—loss of weight, loss of appetite, loss of energy, his complexion, afternoon temperature, increase in moist rales of left lung and stethescope, it is not possible to positively diagnose tuberculosis, because of the fact that there are many other conditions that will produce these same symptoms; that moist rales are present in organic heart trouble allowing a stasis to back blood into the lungs, bronchitis, bronchiectasis, influenza and even a deep set cold; that he had examined defendant's Exhibit No. 6, and stated that Jones' blood pressure was slightly above the average for his height, weight and age, and that that indicated a favorable condition as far as tuberculosis is concerned.

The effect of Dr. Shipp's testimony was to completely discredit the evidence of Dr. Francis, and the methods used by Dr. Francis to ascertain the presence of tuberculosis in the insured.

In August, 1933, Governmental employees having discovered that there were inconsistent statements in the insured's application for insurance and his application for compensation, notified McCoy, the Director of Insurance. McCoy wrote Jones asking an explanation of the inconsistencies and Jones answered promptly that in 1926 he had not thought he had lung trouble; that he had not had con-

vincing symptoms of tuberculosis at that time and that he had not credited Dr. Francis, whose relationship he detailed, until subsequent events made Dr. Francis' opinion appear more accurate.

At the conclusion of all the testimony, the Court directed a general verdict for the Government. The action of the Court in this regard was assigned as error by the appellant.

It is the contention of the appellee that the trial court did not err in withdrawing the case from the jury since it appeared by the undisputed evidence that the reinstatement of the original insurance, converted into the policies sued on, was induced by fraud.

The most damaging statement made by the deceased relative to his application for reinstatement of his insurance is contained in an affidavit made by him under date of July 28, 1929. In this affidavit, referring to Dr. Francis, he stated: "During the summer of 1924 (I do not remember the exact date, but think it was during July or August) Doctor again gave me a thorough examination and told me I had tuberculosis and wanted me to leave this climate at once." This affidavit was made in connection with his application for compensation as a disabled veteran.

On September 9, 1933, the insured addressed a letter to the Veterans Administration in reply to a communication from that office. The letter, in his own language as requested by the bureau, is as follows:

"Veterans Administration,
"Washington, D. C.
    "Attn. Mr. H. L. McCoy, Director
        of Insurance

"Dear Sir: Answering your letter of August 29th, with reference to my claim for insurance benefits, in which you ask for explanation for not disclosing that I had been treated prior to March 22, 1926, for pulmonary tuberculosis:

."Regarding my reply to question No. 10 on 'Application for Reinstatement of Yearly Renewable Term Insurance' to which I answered 'No', I did not believe that I had contracted any disease since lapse of this insurance because I had never believed at that time that I had contracted any disease and I had not taken any treatment for any disease.

"Regarding my answer to question 11, I felt that the fact that I had successfully passed an examination for life insurance was all that was necessary, since I was sure in my own mind that I was physically O. K. and I had never agreed with Dr. Frances in his suggestion that there was anything seriously wrong with me.

"Regarding the statement about my being treated for any disease of throat or lungs to which I answered 'no' this was the case because I had never taken treatment for such an ailment.

"I never up until my examination by the Veterans Bureau in 1929 believed at all that I had tuberculosis. I had talked with Dr. Frances about my condition but since I was living in a low country where malaria is prevalent and also because I had some bad teeth, I felt confident all the time that my general run down condition was due to either one or both of these conditions. In this country, which is low and swampy, malaria is of frequent occurrence. Almost everyone here is troubled occasionally during periods running from a few weeks to several months, with malaria. During these periods the person affected will be in a run down condition, but no one here considers this of any serious consequence. A person easily affected by malaria will perhaps have such an attack once or twice a year, but having a siege of malaria is not thought of by people in this vicinity as a disease. It is merely accepted as one of the disadvantages of living in this climate.

"It was only in 1929 when my examination before the Veterans Bureau showed positively that I had active tuberculosis that I believed at all that my condition was tubercular and that it had reached an advanced stage. Then their examination finally convinced me that I might have contracted this disease, and I immediately went to the hospital for treatment.

"As to my consultations with Dr. Francis, perhaps I should explain my association with him. He was one of the company physicians for Thane Lumber Company (for which concern I was working) and as I handled all the company records of such matters in the course of my duties, it was necessary for me to talk with him, frequently about different matters. When an employee found the services of the doctor necessary for himself or family the doctor would be notified or given an order. His fee for such services were turned into the com-

pany office and was deducted through the payroll. In this way I had occasion to talk with Dr. Francis frequently on other matters, and if I found myself feeling badly, I would say something to him about it. I don't think I ever consulted him in the ordinary manner that a person would consult a physician, that is, to talk with him during a regular consultation. He did tell me that I should move to a higher, drier climate, but since at that time I didn't believe there was anything seriously wrong with me, I didn't follow his suggestions.

"However, in 1929, when the Veterans Bureau examination showed that I did have tuberculosis, I could look back and see the progress of the disease as reflected by my statement and Dr. Francis' statements, but at the time of making application for insurance I wasn't feeling badly, and certainly didn't believe that I had any disease of any serious nature. After the disease had reached a more advanced stage, and it was necessary for me to go to the hospital for treatment, I could look back and readily see that the conditions to which I had paid little attention at the time of their occurrence were in reality steps in the progress of this tubercular condition.

"I trust that this answers your questions satisfactorily. If you wish other information, please advise."

The candid statements of the insured in the instances enumerated above are most commendably frank.

In connection with the contention of the appellant, it might be well to restate a part of the testimony as contained in the record. The insured had worked continuously from 1919 to March 22, 1926. Dr. Francis, the chief witness for the defendant, testified that he treated the insured during 1922 and 1924 and from time to time until the summer of 1926; that he found a rising temperature each afternoon and detected moist rales in the left lung of the insured; that in the Spring of 1924 the rales were more noticeable. At that time he diagnosed the condition of the deceased as active pulmonary tuberculosis. He further stated that the insured continued to report to him until the summer of 1926.

Dr. Francis testified that he examined the insured on December 30, 1925, in connection with an application for insurance with an old line life insurance company and at that time states that he did not find any evidence of past or present disease of the lungs and reported that the insured was a favorable risk for a $1,000 life insurance policy. This statement by Dr. Francis was made less than three months prior to the date upon which the insured was examined by Dr. McCammon for the reinstatement of his policy.

Dr. McCammon examined the insured for the reinstatement of his war risk insurance and testified that he did not find any abnormality of the deceased. Dr. McCammon was the insured's family physician and he knew nothing about the insured having tuberculosis until the Spring of 1929, when he suspected it from his appearance. The insured's case was diagnosed as tuberculosis by the Veterans' Administration physician on June 29, 1929, and later by the doctors of the Veterans Hospital at Legion, Texas, and still later by Dr. Shipp. None of them related his tubercular condition back to March 22, 1926, or to any definite date.

The statements by the insured relative to the condition of his health at the time he made application for reinstatement of his insurance find support in the testimony of Dr. Francis, Dr. McCammon and other witnesses. Dr. Francis had reassured Jones by his New York Life Insurance examination some three months prior to his examination for the reinstatement of his war risk policy, that he did not have a tubercular condition and the insured stated that he relied upon these statements in making his application for reinsurance.

■ The question is not whether the insured in fact had tuberculosis on March 22, 1926, but whether he knew he had tuberculosis and made false answers to the questions as to whether or not he had consulted a doctor and whether or not he had any disease of his lungs at that time.

■ There was a sharp conflict in the substantial evidence on each side relative to the state of health of the insured at the time of reinstatement of the policies and as to his knowledge thereof at such time. Therefore the case should have been submitted to the jury for determination. Northwestern Mutual Life Insurance Company v. Cohn Bros., 9 Cir., 102 F.2d 74. The testimony of Dr. Shipp alone was sufficient to justify the trial court in submitting this cause to the jury.

■■ The defense of fraud as set up by the defendant is an affirmative one,

which places the burden upon the defendant. In Wharton v. Aetna Life Ins. Company, 8 Cir., 48 F.2d 37, 42, this Court, speaking through Judge Gardner, said:

"Misrepresentations will not void a policy unless the insured knew they were false, or he were chargeable with such knowledge. Security Life Insurance v. Brimmer (C.C.A.) 36 F.2d 176, 179; Bankers' Reserve Life Co. v. Matthews (C.C.A.) 39 F.2d 528, 537; Moulor v. American Life Ins. Co., 111 U.S. 335, 4 S.Ct. 466, 28 L.Ed. 447; Mutual Life Ins. Co. v. Hilton-Green, 241 U.S. 613 [36 S.Ct. 676, 60 L.Ed. 1202]; Northwestern Mutual Life v. Wiggins (C.C.A.) 15 F.2d 646; New York Life Ins. Co. v. Griffith (C.C.A.) 35 F.2d 945; Adler v. New York Life Ins. Co. (C.C.A.) 33 F.2d 827; Metropolitan Life Ins. Co. v. Johnson, 105 Ark. 101, 150 S.W. 393.

"In Bankers' Reserve Life Company v. Matthews, supra, this court said with reference to misrepresentations alleged to have been falsely made: 'Being representations, they do not void the contract, even though untrue in fact, provided they were honestly made in the belief by insured that they were true. That is, they must be both untrue and knowingly falsely made by insured.'"

It is the contention of the appellant that the insured's answers in his application for reinstatement for his insurance were not warranties but representations; that they were made prior to the execution of the policies sued on. They are not referred to in the policies, nor are they made a part of the policies sued on, and that even though representations are not true, where they are such that reasonable men in the exercise of an honest judgment might reach different conclusions as to whether the insured intentionally misrepresented the facts, the issue is one which should be submitted to a jury.

In the case of Bailey v. United States, 5 Cir., 92 F.2d 456, 458 an action on a converted war risk policy, the defendant presented the defense of fraud in the reinstatement of the policy and upon trial at the conclusion of the case the Court held that the evidence conclusively showed that the false statements of fact had been made in connection with the reinstatement application and that this was fraud without regard to whether plaintiff knew or believed the statements to be false, and directed a verdict for the defendant on the ground that the reinstatement had been procured by fraud. Upon appeal the judgment of the lower court was reversed and the cause remanded. In this case the Court said: "We think it quite plain that the evidence appellee tendered on its issue of fraud, at best for it, made only an issue for the jury. It did not establish, as matter of law, either that the statements made in the application for reinstatement were false, or that they were knowingly and willfully made with intent to deceive. That some of the statements made in connection with appellant's claims under his war risk policy, and for compensation, cannot be reconciled with others made by him and his physician, is quite plain. It was for the jury, however, and not for the court, to say which statements were true and which were false, which were innocently and which fraudulently made."

The rule governing the power of the trial court to direct a verdict for either party is well settled by the following cases: Gunning v. Cooley, 281 U.S. 90, 94, 50 S.Ct. 231, 74 L.Ed. 720, 724; Lumbra v. U. S., 290 U.S. 551, 54 S.Ct. 272, 78 L.Ed. 492; Schwarz v. Fast, 8 Cir., 1939, 103 F.2d 865, 867; United States v. Dupire 8 Cir., 1939, 101 F.2d 945, 948; Asher v. United States, 8 Cir., 1933, 63 F.2d 20, 23.

In Asher v. United States, supra, a war risk insurance case, the trial court directed a verdict for the Government as in the instant case. On appeal this Court reversed the trial court and speaking through Judge Gardner, defined the rule: "In passing on the motion for a directed verdict, it was the duty of the court to take that view of the evidence most favorable to the plaintiff, and to determine the matter from that evidence and such inferences as may reasonably be drawn therefrom. If, when so viewed, the evidence was of such a character that reasonable men might reach different conclusions, then the case should have been submitted to the jury."

In the case of United States v. Dupire, supra, the same rule was announced by this Court speaking through Circuit Judge Van Valkenburgh.

It can serve no good purpose to further extend this opinion. It follows that for the failure of the Court to submit this case to the jury, the cause should be reversed and remanded, and it is so ordered.